96 Cal.Rptr.2d 778 (2000)
81 Cal.App.4th 415
In re CLIFFTON B., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Carl B. et al, Defendants and Appellants.
No. G025902.
Court of Appeal, Fourth District, Division Three.
June 8, 2000.
Review Denied August 30, 2000.
*779 Richard Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant Carl B.
Stephanie M. Davis, under appointment by the Court of Appeal, Marina Del Rey, for Defendant and Appellant Deborah B.
Laurence M. Watson, County Counsel, and Rachel M. Bavis, Deputy County Counsel, for Plaintiff and Respondent.
Marsha Faith Levine, under appointment by the Court of Appeal, Irvine, for the Minor, Cliffton B.
Stephen S. Buckley, under appointment by the Court of Appeal, for the Minor, Zachary B.

OPINION
SILLS, P.J.
Carl and Deborah B. appeal from the order of the juvenile court terminating Carl's parental rights to their younger son, Cliffton. They claim Carl had made sufficient progress on his drug abuse treatment program by the time of the permanency hearing to justify reversing the previous order germinating reunification services. (Welf. & Inst.Code, § 388.)[1] Alternatively, they claim Cliffton's relationship with his father is so beneficial that parental rights should not be terminated. (§ 366.26, subd. (c)(1)(A).)
Carl also claims the juvenile court should have made orders maintaining the relationship between Cliffton and his older brother, Zachary, who was placed in longterm foster care. Carl points out both *780 children were represented by one attorney, who did not advocate for sibling visitation or represent Zachary's interests. Carl claims this was an impermissible conflict of interest and constitutes ineffective assistance of counsel, which he raises on Zachary's behalf. Cliffton does not dispute the termination of parental rights, but he too claims the juvenile court should have made orders preserving his relationship with Zachary and raises ineffective assistance of counsel. Zachary, for whom we appointed independent appellate counsel, joins in Cliffton's claims.
We affirm the termination of parental rights, find ineffective assistance of counsel, and remand the case for a new hearing on the sibling visitation order.
Cliffton and Zachary were taken from their parents and placed in Orangewood Children's Home (OCH) in August of 1997, when Cliffton was twenty months old and Zachary was 10 years old. This family had been troubled for years; both parents have a history of drug and alcohol abuse, and Deborah, the mother, was diagnosed as bipolar in 1992. Prior to the series of events that culminated in the children's detention, Orange County Social Services Agency (SSA) had received 16 child abuse reports involving this family, dating back to 1985.
In June 1997, Cliffton's four-month-old sibling, Rachel, died when Deborah accidentally rolled over onto the baby in her sleep, smothering her. The home was described by investigators as dirty and unkempt, and next to the bed were found a marijuana cigarette and a glass pipe in an ashtray. Apparently, a friend had given Deborah some drugs for a birthday present a few days before. A month later, an intoxicated Deborah was hospitalized under section 5150 after throwing things and breaking windows. She returned home, but was re-hospitalized a week later after she slapped Carl and yanked Cliffton out of the bathtub. After a few days, while Carl was napping, Cliffton wandered out of the house and was found clad only in a diaper in the middle of a busy intersection.
While the brothers were at OCH, they saw each other daily. Zachary told workers, "I need to see Cliffy every day," and their mutual enjoyment of their time together was well documented. During visits with the parents, Cliffton would cry and pull away from his mother, but would sit on Zachary's lap or play quietly next to him. Zachary was described as "parentified," in that he worried about the welfare of his parents and Cliffton.
SSA was not able to find a foster home for both brothers, so they were placed in separate homes, cutting down their visits to once a week. Zachary's social worker reported, "Zachary ... worries greatly about Cliffton and truly does need to see him each week. Cliffton is always happy to see his brother."
Carl participated consistently in his reunification plan for twelve months. Although he attended parenting classes and drug abuse counseling, he tested positive for drug use several times until April 1998. After that he remained sober. At the twelve-month review hearing, the juvenile court adopted SSA's recommendation and released Cliffton to Carl for a 60-day trial visit, with the hope that Zachary would "follow soon after."
The trial visit went well. Cliffton adjusted happily to Carl's home, attending day care with no problems while Carl worked. Carl continued to participate in counseling and twice-a-week drug testing, kept his home neat and properly stocked with food, and used appropriate parenting skills. Carl's counselor observed, "Dad does a good job with the kid...." In November 1998, the juvenile court ordered Cliffton placed with Carl under a plan of family maintenance; on February 4, 1999, Zachary began a 60-day trial visit in the home.
Unfortunately, Carl's recovery faltered. On February 16, SSA received test results from January 28 and February 1 indicating Carl had ingested methamphetamine on at least one occasion in late January. *781 Carl admitted his "mistake," explaining he was stressed because his mother had recently died and he was feeling financial pressures. The brothers were removed from his home and placed again in OCH. SSA filed a supplemental petition (§ 387), to which both parents entered no contest pleas. The juvenile court sustained the petition, denied reunification services because the parents had already received the maximum amount, and set a permanency hearing for both children on August 23.
On the day of the permanency hearing, Carl filed a petition under section 388, requesting custody of Cliffton and Zachary or, alternatively, additional reunification services. Before the hearing began, however, all counsel stipulated to long-term foster care as a permanent plan for Zachary, and the petition was withdrawn as to him. Carl's declaration stated he had been Unemployed full-time at the same job for a year and a half; he owned his home; he had been attending drug testing and counseling twice weekly, with no positive tests since his relapse in February; he attended Alcoholics Anonymous meetings weekly and had a sponsor who was also a co-worker. He enjoyed unmonitored visits with Zachary every Saturday for six hours, and he had a two-hour monitored visit with Cliffton every Friday.
When asked what circumstances had changed since April, Carl said, "Me. Myself.... I am much more able to deal with life on life's terms. I am learning how to face things from a proper perspective. I am not trying to run away from things. I am willing to face them head on.... [I]f I start to feel myself in a position where I feel weak and powerless then I have people to help support me ... and I feel like I am a different person." Carl had been promised a promotion at his job within the next month, and he appreciated "the fact that they actually recognized me where I work as being more capable than just being a technician.... My life is really starting to be a lot better and ... there is much more that I find pleasing, exciting, motivating. It's a different world for me. Life is good. It's fun. It's enjoyable, you know, it's not just a pain."
The court reluctantly denied Carl's petition because it found he had not met his burden of showing changed circumstances. "The problem is you had it all. We gave it all back to you. You had Cliffton home on a family maintenance plan. Zachary was returned to you on a 60-day trial visit. You have been going to the counseling. You have been doing that. You have regularly come to court for your appearances. We talk every time you come. You had this support system that you are relying on today. The support system has been in place for a long time now. [¶] The changed circumstances are really not so much change. It is just more of what you have been doing. [¶] At this point, based on several months of sobriety that you had and your long history of relapsing after periods of sobriety, I am not willing to put Cliffton through that again. I am not going to do that."
The next day, the juvenile court conducted the permanency hearing. The social worker's report confirmed Carl's excellent progress. Carl's therapist reported, "Carl is doing fine. The father's ability to confront and deal with his problems has improved, since his relapse. He used to use denial." Carl's group counselor labeled him "a jewel" and said his relapse was "not unusual." Carl's current social worker, Elizabeth Mavity, testified her observation of a recent visit between Carl and Cliffton revealed "a very warm affectionate relationship between the father and the child. The father was willing to play with the child, to be with the child, to accommodate the child." Cliffton's reaction to Carl was "equally warm and responsive."
Mavity was concerned, however, about the long substance abuse history. "While the father has done his services in an exceptional manner he did have the relapse behavior at the end of January and *782 the beginning of February and that was close to the point where he was going to graduate from the program the first time and he's due to graduate again shortly.... [¶] I'm just concerned that that could happen again and I wouldn't want to see the child exposed to that kind of situation again." She acknowledged terminating parental rights would have "some negative effect" on Cliffton, but the risk of being removed from his family again outweighed the value of the relationship.
During closing arguments, Rebecca Captain, who was appointed to represent both Cliffton and Zachary, made the following statement: "First I would like to mention that off the record there was a discussion about a conflict or a possible conflict that minor's counsel might have had regarding representing Zachary who's Cliffton's 12year-old brother and representing Cliffton in regards to Zachary going into long-term foster care yesterday and the recommendations on Cliffton being to terminate his parental rights for adoption. [¶] Individually I don't have a problem with either one of the recommendation[s] but in representing both I was concerned about that and would just want to, knowing the court's position, just want to state on the record that I know that my client, Zachary, who is Cliffton's brother[,] is very opposed to his brother's parental rights being terminated today and any effect that would have on his continuing relationship with his brother or visitation or being able to live with him in the future. But with that said I'll move to closing."[2]
The juvenile court found that although Carl had maintained regular visitation and contact with Cliffton, he had not demonstrated their relationship would be more beneficial to Cliffton than a permanent home with adoptive parents. "We're at a point now where this court needs to decide do we kind of let the status quo go on because is it more important that Cliffton see you on a regular basis or is it more important that he be able to start a life with a permanent family ... [¶] I have no doubt that both parents love Cliffton deeply but `frequent loving contact' ... is not enough. [¶] Monitored visits once a week are not really enough.... [F]or six days and 22 hours out of every week, you weren't there as Cliffton's parents and you lost that role for almostwell, certainly a little more than a third of his life.... [¶] [F]or the past several months there hasn't really been a parent/child relationship and we weren't to the point in these proceedings where you had earned the opportunity to redevelop the parent/child relationship." Because Cliffton was clearly adoptable, the court terminated parental rights.[3]

*783 The section 388 petition was properly denied
Carl claims the juvenile court should have granted his petition under section 388 because full compliance with his treatment plan, coupled with seven months of clean tests, are sufficient to change the circumstances of an isolated relapse. Section 388 allows an interested person to petition the juvenile court for a hearing to change, modify or set aside a previous order if the petitioner can establish changed circumstances and that the proposed order would be in the best interests of the child. The burden of proof is on the petitioner. (In re Casey D., (1999), 70 Cal.App.4th 38, 82 Cal.Rptr.2d 426; In re Richard C. (1998) 68 Cal.App.4th 1191, 80 Cal.Rptr.2d 887.) The juvenile court here determined Carl had not met that burden. We will not reverse the juvenile court's determination unless Carl can show it was an abuse of discretion. (In re Casey D., supra, 70 Cal.App.4th at p. 47, 82 Cal.Rptr.2d 426.) He has not done so.
Carl's seven months of sobriety since his relapse in January, while commendable, was nothing new. He had a history of drug use dating back to his college days, and since then his periods of sobriety alternated with recurring drug use. Even after the initial detention of his children, it took Carl six months before he was able to stay sober for any length of time. Then, after eight months of sobriety, he still succumbed to the temptation of illegal drugs. As Carl's counselor confirmed, relapses are all too common for a recovering drug user. "It is the nature of addiction that one must be `clean' for a much longer period than 120 days to show real reform." (In re Kimberly F. (1997) 56 Cal.App.4th 519, 531, fn. 9, 65 Cal. Rptr.2d 495.) In Carl's case, 200 days was not enough to reassure the juvenile court that the most recent relapse would be his last.
The refusal to apply the benefit exception is supported by substantial evidence
Section 366.26, subdivision (c)(1)(A) authorizes the juvenile court to avoid the termination of parental rights to an adoptable child if it finds "a compelling reason for determining that termination would be detrimental to the child [because] ... [t]he parents or guardians have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Carl points out there is no dispute that he maintained regular visitation and contact, and he claims his relationship with Cliffton is of the nature and quality contemplated by the statute.
Although the statute does not specify the type of relationship necessary to derail termination of parental rights, case law has required more than "frequent and loving contact." (In re Beatrice M. (1994) 29 Cal.App.4th 1411, 1418, 35 Cal.Rptr.2d 162.) "[T]he court balances the strength and quality of the natural parent-child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (In re Autumn H. (1994) 27 Cal.App.4th 567, 575, 32 Cal.Rptr.2d 535.)
Carl argues his situation is markedly different from Beatrice M. and Autumn H. because in each of those cases the child was removed from the parent's custody at or near birth and never had the opportunity to develop a parental relationship. In contrast, Cliffton was almost two years old when he was detained and was returned to Carl's care for six months when he was three and a half years old. Carl testified, "We bonded when he was living at home with me for the six months.... We are still very close. He still calls me daddy. *784 He comes and runs up and jumps in my arm asking me to hold him and we hug and kiss. We are very close." This "warm affectionate relationship" was confirmed by the social worker, and she acknowledged terminating the relationship would involve some risk to Cliffton.
Admittedly, this is a very close case. Considering the artificial restraints created by monitored weekly visitation, Carl has maintained a significant relationship with Cliffton. But Autumn H. teaches that the juvenile court must engage in a balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family. Cliffton is young and has adjusted well to his foster family, who are willing to adopt him. As the social worker commented, "If he has good structure and affection and he's safe and stable from an early age ... he's going to have a better chance in life than he's had so far." The juvenile court balanced this potential benefit against the risk that returning him to Carl would result in another disruption in his life, further eroding his ability to develop trust and to bond with others. Substantial evidence supports the court's conclusion, and we will not disturb it.

Sibling visitation
Carl, Cliffton and Zachary all claim the juvenile court should have made sibling visitation orders when terminating parental rights to Cliffton so the concededly close and valuable relationship between the two brothers would be maintained. They claim the juvenile court's adoption of SSA's recommendation for sibling visitation of one hour twice a month did not fulfill its statutory duty to consider a sibling plan.
Carl "has no standing to raise issues regarding [Cliffton and Zachary's] interest in each other, since his own rights have not been affected thereby." (In re Jasmine J. (1996) 46 Cal.App.4th 1802, 1806-1807, 54 Cal.Rptr.2d 560.) He is not aggrieved by the sibling visitation order, because his interest in these proceedings was to reunify with Cliffton. (In re Nachelle S. (1996) 41 Cal.App.4th 1557, 1562, 49 Cal.Rptr.2d 200.) We address the issue, however, because it is properly raised by Cliffton.[4]
The argument is based on section 16002, which became effective in 1994. That section expresses the intent of the Legislature to "ensure the preservation and strengthening of the child's family ties" by placing siblings removed from their homes together in foster care. To that end, the statute directs: "(b) The responsible local agency shall make a diligent effort in all out-of-home placements ... to maintain sibling togetherness and contact. When maintaining sibling togetherness is not possible, diligent effort shall be made, and a case plan prepared, to provide for ongoing and frequent interaction among siblings until family reunification is achieved, or, if parental rights are terminated, as part of developing the permanent plan for the child. If the court determines by a preponderance of the evidence that sibling interaction is detrimental to a child ..., the reasons for the determination shall be noted in the court order, and interaction shall be suspended.
"(c) When there has been a judicial suspension of sibling interaction, the reasons for the suspension shall be reviewed at each periodic review hearing pursuant to Section 366. When the court determines that sibling interaction can be safely resumed, that determination shall be noted in the court order and the case plan shall *785 be revised to provide for sibling interaction.
"(d) If the case plan for the child has provisions for sibling interaction, the child, or his or her parent or legal guardian shall have the right to comment on those provisions."
In 1998, the Legislature added subdivision (e) to section 16002, which pertains to sibling contact after parental rights are terminated: "If parental rights are terminated and the court orders a dependent child to be placed for adoption, the licensed county adoption agency or the State Department of Social Services shall take all of the following steps to facilitate ongoing sibling contact.... [¶] (1) Include in training provided to prospective adoptive parents information about the importance of sibling relationships to the adopted child and counseling on methods for maintaining sibling relationships, [¶] (2) Provide prospective adoptive parents with information about siblings or half-siblings of the child, except the address where the siblings or half-siblings of the children reside. However, this address may be disclosed by court order for good cause shown, [¶] (3) Encourage prospective adoptive parents to make a plan for facilitating postadoptive contact between the child who is the subject of a petition for adoption and any siblings or half-siblings of this child."[5]
The parties suggest the juvenile court should have considered sibling interaction (and Zachary's interests) when deciding whether to terminate parental rights to Cliffton. They are wrong. The focus of the .26 hearing was to select the best permanent plan for Cliffton; Zachary's wishes are not a consideration. In re Gerald J. (1991) 1 Cal.App.4th 1180, 1188, 2 Cal.Rptr.2d 569.) The statutes and case law have made it clear that parental rights to an adoptable child should be terminated unless one of the statutory exceptions apply. As discussed ante, none applies here. And there is no separate exception for the child's general best interests. "[C]onsideration of the child's best interests is inherent in the legislative procedure for selecting and implementing a permanent plan. The four specified exceptions to adoption provided in section 366.26, subdivision (c)(1) are a final check to ensure termination of parental rights is in the best interests of the minor and is the least detrimental alternative. In this regard, the Legislature recognized that in certain specific instances, a plan other than adoption may be appropriate and less detrimental to the rights of both parent and child. [Citation.] Preserving the child's relationships with relatives other than a parent was not one of those instances." (In re Tabatha G. (1996) 45 Cal. App.4th 1159, 1165, 53 Cal.Rptr.2d 93.)
After the permanent plan is selected, however, sibling contact remains an issue. SSA points out section 16002 is directed specifically to SSA and does not place any affirmative duty on the juvenile court unless sibling interaction is suspended. We acknowledge this literal reading of the statute; but the obvious intent of the Legislature would be eviscerated if the juvenile court were not required to consider sibling contact for a dependent child over whom it has jurisdiction. The statute contemplates that sibling contact will be an ongoing issue subject to periodic review throughout the dependency proceedings. *786 When the juvenile court terminates parental rights and refers a child for adoption, it retains jurisdiction over that child until the adoption is effected. During that interim period, the juvenile court can make visitation orders as it sees fit, and sibling contact should remain the subject of its concern.
Here, the juvenile court did consider sibling visitation. It adopted SSA's report, which recommended sibling visitation of two hours per month, "provided the prospective adoptive parents are willing to facilitate." Although this amount of visitation does not satisfy appellate counsel, it certainly fulfilled any implied duty the juvenile court has to consider sibling visitation.

Ineffective assistance of counsel for Cliffton and Zachary
Carl and the children contend[6] the children were provided ineffective assistance of counsel because their joint representation created a conflict of interest. There is no doubt that in this case there was an actual conflict of interest, as evidenced by Ms. Captain's comments and the juvenile court's subsequent actions. SSA concedes this point but asserts that failure to appoint independent counsel for children with diverse interests is subject to a harmless error analysis. (In re Candida S. (1992) 7 Cal.App.4th 1240, 1253, 9 Cal. Rptr.2d 521.) SSA argues that because independent counsel could not have affected the termination of parental rights to Cliffton, no error occurred.
But SSA misses the point. While the selection of Cliffton's permanent plan would probably have been the same, the post-termination contact between Cliffton and Zachary would most likely not have been the same. Both brothers have an interest in the frequency and duration of their visits during the period of time between termination of parental rights and the final adoption order. Furthermore, the maintenance and strengthening of the fraternal bond during these months may have a significant influence on the willingness of the prospective adoptive parents to continue sibling contact and on the visitation plan SSA is required to formulate in its final adoption report. Accordingly, we conclude the juvenile court erred in failing to appoint independent counsel for each brother.

Disposition
The order terminating parental rights to Cliffton is affirmed. The sibling visitation order is reversed and remanded to the juvenile court for a new hearing on post-termination sibling contact. At that hearing, each brother shall continue to be represented by independent counsel.
RYLAARSDAM, J., and BEDSWORTH, J., concur.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] On the previous day, Ms. Captain stated, "Rebecca Captain appearing on behalf of Cliffton B[.] on the [section] 388 [petition] and also I just wanted the record to reflect that we have had an off the record discussion about a possible conflict and that the Court did not believe I had a conflict. Let the record reflect that." We have been advised that after the selection and implementation hearing, Ms. Captain declared a conflict, and on October 18, 1999, the juvenile court appointed separate counsel to represent the brothers.
[3] SSA has filed two separate motions requesting us to take additional evidence of events subsequent to the date of the order on appeal. (Code Civ. Proc, § 909; Cal. Rules of Court, rule 23(b).) Cliffton's social worker declares that as of February 17, 2000, Cliffton and Zachary were scheduled to visit two times per month. Although Cliffton's foster mother was cooperative, there were logistic complications with Zachary's group home arrangement, and the boys actually visited approximately once a month. The boys both enjoy the visits. The foster mother informally agreed to facilitate visits once a month but said the family intends to move out of the area. She is willing to continue telephone and written contact.

Zachary's social worker declares that Carl tested positive for drugs in January 2000. Also, during the Christmas 1999 holiday period, Carl allowed Zachary to have unauthorized contact with the mother and left Zachary with "an unauthorized caretaker" (the maternal grandmother).
The proffered evidence does not affect our analysis; accordingly, we decline to grant the motions. (See Tyrone v. Kelley (1973) 9 Cal.3d 1, 13, 106 Cal.Rptr. 761, 507 P.2d 65; Pack v. Vartanian (1965) 232 Cal.App.2d 466, 476-477, 42 Cal.Rptr. 729.)
[4] SSA also claims the issue of sibling visitation was waived because no one raised it in the trial court. This may be true as to Carl. (In re Anthony P. (1995) 39 Cal.App.4th 635, 46 Cal.Rptr.2d 107.) But the waiver argument does not apply to the children, when the crux of their ineffective assistance of counsel argument is that their counsel failed to raise the sibling visitation issue.
[5] Section 16002, subdivision (e) was part of Assembly Bill 2196 (Assem. Bill No. 2196 (1998 Reg. Sess.) § 3.), which also included the addition of section 366.29 and the amendment of Family Code section 8715. These sections, dealing with the actual adoption hearing, require the adoption report to describe the efforts made under section 16002, subdivision (e) (Fam.Code, § 8715, subd. (b)), and provide that the court may include orders for postadoptive sibling contact in the final adoption order "[w]ith the consent of the adoptive parent or parents." (§ 366.29, subd. (a).) The statute hastens to provide, however, that "[i]n no event shall the continuing validity of the adoption be contingent upon the postadoptive contact, nor shall the ability of the adoptive parent or parents and the child to change residence within or outside the state be impaired by the order for contact."
[6] SSA argues Carl has no standing to raise ineffective assistance of counsel on behalf of his children. But in In re Elizabeth M. (1991) 232 Cal.App.3d 553, 283 Cal.Rptr. 483, the court held a "father has standing to assert his child's right to independent counsel, because independent representation of the children's interests impacts upon the father's interest in the parent-child relationship." (Id. at p. 565, 283 Cal.Rptr. 483.) This case was in the same procedural context (an appeal after termination of parental rights to some of the siblings) and the conflict of interest was the divergent interests in sibling visitation.