Filed 4/16/13  In re John M. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| In re JOHN M., a Person Coming Under the Juvenile Court Law. | B244077 (Los Angeles County Super. Ct. No. CK50811) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CAMILLE T., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Rudolph A. Diaz, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Camille T. (Mother) appeals from the juvenile court's order of September 10, 2012, terminating her parental rights over John M., born in June 2011.

Mother contends the juvenile court erred in terminating her parental rights because substantial evidence established a beneficial parent-child relationship exception to adoption. We conclude Mother did not show the existence of a beneficial parent-child relationship exception to adoption and affirm the order of the court.

## BACKGROUND

On July 1, 2011, the Department of Children and Family Services (DCFS) filed a petition pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect) and section 300, subdivision (g) (no provision for support) on behalf of John M. after Mother and John M. tested positive for cocaine at John M.'s birth.[1] As sustained, paragraph b-1 of the petition alleged under section 300, subdivision (b) that John M. was born with a positive toxicology screen for cocaine. As sustained, paragraph b-2 of the petition alleged under section 300, subdivision (b) that Mother has a nine-year history of substance abuse and is a current user of cocaine; Mother used cocaine during her pregnancy; Mother had a positive toxicology screen for cocaine at John M.'s birth; and John M.'s five siblings had received permanent placement services due to Mother's substance abuse. As sustained, paragraph b-3 of the petition alleged under section 300, subdivision (b) that Mother has mental and emotional problems, including visual and auditory hallucinations. As dismissed, paragraph b-4 of the petition alleged under section 300, subdivision (b) and paragraph g-1 of the petition alleged under section 300, subdivision (g) that alleged father John M. (alleged Father) failed to provide John M. with the necessities of life.

DCFS reported that Mother had "at least a nine year history of drug abuse" and had a criminal history including prostitution and drug use. Mother's five other children were born "prenatally exposed to cocaine." Mother failed to reunify with them and had a history of failing to visit her children. Mother could not explain why she had not been

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

able to reunify with her children. While at the hospital with John M., Mother told a hospital social worker about "speaking to aliens and flying on a space ship" and told DCFS that she had left a "previous program" because she had seen "'blue arms'" or "'blue worms'" in the toilet. She stated that although she used two gallons of bleach to clean the toilet, "she could still see the blue." Mother denied having mental health issues, visual and auditory hallucinations, or that she took medications. She later denied that she had made statements referring to aliens and being on a spaceship.

When informed of the positive toxicology reports the day after John M. was born, Mother told DCFS, "'I'm not gonna do those mother fuckin classes again.'" Mother stated that she had used cocaine for "[a]while" and that she had used cocaine knowing she was pregnant. Mother stated she was living with her brother-in-law, but could not provide his address. Maternal grandmother had "kicked her out."

John M. was detained at the hospital. Mother and alleged Father did not appear at the detention hearing on July 1, 2011. The juvenile court ordered John M. detained and ordered monitored visits for Mother. John M. ultimately was placed with Mother's relative, Aretha B. Alleged Father requested a paternity test. Subsequently, alleged Father was determined not to be John M.'s biological father. John M.'s biological father was never found.

In August 2011, Mother tested positive for benzodiazepine, opiates, codeine, morphine, and cocaine. DCFS reported that in late August 2011, Mother enrolled in a mental health and substance abuse program at Women's Re-Integration Services and Education Center. During a monitored visit in September 2011, Mother became angry at seeing John M. with Aretha B. Mother first said that she did not want "to have to deal with her family in order to get her son back," then denied that Aretha B. was related to her. She was upset that Aretha B. was in the process of adopting one of her other children. A few days later, an anonymous caller claimed that Aretha B. was abusing and neglecting John M. The allegations were determined to be unfounded. Subsequently, Mother visited John M. once a week at DCFS's office. Mother was reported to talk to herself and have an "unstable" demeanor. At later visits, Mother "appeared to be

somewhat aloof." Mother missed a visit in October 2011, then was late to a rescheduled visit and did not see John M. Mother failed to attend John M.'s doctor's appointment and was late to subsequent visits. Mother was over an hour late to one visit, but held John M., fed him, and interacted appropriately with him.

On October 4, 2011, the juvenile court adjudged John M. a dependent child of the court pursuant to section 300. At the contested disposition hearing on November 9, 2011, the juvenile court declared John M. a dependent of the court, removed custody from Mother, and ordered him suitably placed. The court did not order reunification services for Mother.

Meanwhile, Mother tested negative three times from October 14 to November 4, 2011, and continued to participate in a substance abuse treatment program. Mother had been diagnosed with "Mood Disorder and Cocaine Dependence," but was noncompliant with her mental health medications. Mother told DCFS that she was pregnant. Subsequently, Mother canceled some visits, ended visits early, and failed to meet John M. at a medical appointment. She was observed talking to herself and becoming impatient with the visits. DCFS reported that Mother did not "demonstrate an understanding or knowledge of the developmental and other special needs that [John M.] has, as a direct result of her drug use during her pregnancy with him." And Mother quickly resorted to physical discipline when John M. or his sibling engaged in normal childhood behavior such as climbing on tables or playing with an electrical outlet. In March 2012, Mother confronted Aretha B., asking her why she was trying adopt the children and stating that "'they' told her at court that she is getting [John M.] back in June." During another visit, Mother gave John M.'s and his sibling's "Gerber life insurance" certificates to Aretha B. but had filled out the incorrect birthdates for the children, and had to be informed of the correct dates. She also gave John M.'s social security card to Aretha B.

John M. was observed to have significant developmental delays, but continued to thrive in the home of Aretha B., who wanted to adopt John M. DCFS initiated family

4

preservation services to provide support for Aretha B. in coping with Mother's anger over John M.'s placement. Thereafter, Aretha B.'s home study was approved.

Mother had appropriate visits in April, May, and June 2012. At one visit, she brought two Easter baskets for John M. and his sibling, fed John a bottle of milk, and gave him candy. John M. smiled and made "cooing" noises to Mother and Aretha B. when they talked to him. At another visit, Aretha B. discussed John M.'s behavior with Mother and Mother held John M. in her lap while he slept. Mother also changed John M.'s diapers, talked to him, and discussed birthday plans for John M.

In July 2012, DCFS reported that John M. "is presenting with serious developmental and emotional issues," "has become more independent and strong willed," and "has severe tantrums at times including head banging." But Mother "doesn't demonstrate an interest in becoming familiar with his special needs, and doesn't appear to know how to interact with him beyond feeding and changing his diaper." Mother did not know how to handle John M.'s temper tantrums. Mother did not participate in discussions regarding John M.'s behavior, growth, development, and medical needs. She did not show an interest in playing with John M., failed to intervene when John M. engaged in inappropriate activities, did not change John M.'s diapers unless requested to do so by Aretha M., and complained and put down John M. when he drooled on her. Mother tested negative for drugs and continued to participate in counseling.

Mother filed a section 388 petition, which was denied without a hearing on September 5, 2012. Prior to the contested section 366.26 hearing, DCFS reported that while Mother continued to visit John M., her interaction with John M. was minimal and she often needed to be told to care for him. She appeared "to rely on the monitor and [Aretha B.] to have the primary responsibility during the visit." DCFS also expressed concerns that Mother's ongoing serious mental health issues, illustrated by "making up stories about things that are happening during Court proceedings," presented a safety risk to John M. if Mother had any unsupervised visits.

At the contested 366.26 hearing on September 10, 2012, John M.'s counsel joined with DCFS in requesting that the juvenile court terminate parental rights. The court

noted that Mother had tried to maintain contact with John M., but her visits had remained monitored. The court noted that Mother had brought snacks to John M. and had held him, but that John M. shared a stronger bond with Aretha B. than with Mother. The court concluded that it would be detrimental to sever the bond between Aretha B. and John M. and that it would be in his best interest to terminate parental rights. The court determined that John M. was adoptable and there was no exception to termination of parental rights. The court terminated Mother's parental rights and the parental rights of all other persons, known or unknown, claiming maternity or paternity of John M. Mother appealed.

## DISCUSSION

### A. The parent-child relationship exception to termination of parental rights and standard of review

Once the juvenile court has determined by clear and convincing evidence "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) "Adoption, where possible, is the permanent plan preferred by the Legislature. [Citations.] 'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573–574.) If the court finds a compelling reason for determining that termination would be detrimental to the minor, the court shall not terminate parental rights but shall order legal guardianship or long-term foster care for the minor. (§ 366.26, subd. (c)(4)(A).) Section 366.26, subdivision (c)(1)(B) sets forth six circumstances where the court may forgo adoption and retain parental rights. One of the reasons is if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parental relationship must be more than "'frequent and loving contact.'" (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural

6

parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Id.* at pp. 575–576 [substantial evidence supported juvenile court's order terminating parental rights where relationship was one of friendship and termination of relationship would not be detrimental to minor, who had been a dependent for three-quarters of her young life and needed a stable, permanent home].)

"When contesting termination of parental rights under the statutory exception that the parent has maintained regular visitation with the child and the child will benefit from continuing the relationship, the parent has the burden of showing either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child.  [Citation]." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) We review the juvenile court's determination of whether the parent-child exception to termination of parental rights exists under the sufficiency of the evidence standard.  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Ibid.*)

**B. Mother did not show that the parent-child relationship exception to termination of parental rights applied**

Mother contends that the parent-child relationship exception to termination of parental rights applied because John M. shared a beneficial bond with Mother that outweighed any alleged benefits of adoption. We disagree.

Although the evidence shows that Mother maintained regular visitation with John M., we conclude that Mother did not establish that John M. shared a beneficial bond with Mother that outweighed any alleged benefits of adoption. We are not convinced by Mother's arguments that there was an "extraordinarily strong bond of love between mother and John [M]." Mother argues that during visits, Mother greeted John M. appropriately; brought gifts to John M.; fed John M. snacks; changed John M.'s diapers; talked to John M.; provided Aretha B. with John M.'s life insurance certificate and social security card; and discussed John M.'s progress with Aretha B. She points to visits where John M. "'made cooing noises and smiled when [Mother] talked to him'" and where Mother "'held John [M.] in her lap while he slept.'"

But Mother cites to selected incidents during visits that occurred primarily in March and April 2012 and ignores the subsequent visits when John M. became more difficult to handle and Mother became disengaged. And at visits that were otherwise appropriate, the evidence shows that Mother sometimes arrived late or ended visits early. DCFS also reported that Mother talked to herself during visits, did not take her medication, and fabricated stories, expressing concern that her mental issues would not allow her to appropriately care for John M. on an unsupervised basis. Mother acted inappropriately by resorting to physical discipline in response to John M.'s normal childhood behavior and did not understand that John M. had developmental issues as a result of his drug-exposure. As John M. became more independent and strong-willed and presented with serious developmental and emotional problems, Mother became distant and disengaged and did not show an interest in "becoming familiar with his special needs." She did not know how to handle John M.'s temper tantrums, did not show an interest in playing with John M., failed to intervene when John M. engaged in

8

inappropriate activities, and did not change John M.'s diapers unless requested to do so by Aretha M. Mother complained when John M. drooled on her and put him down. She depended on the monitor and Aretha B. to provide primary care for John M. during these visits. She did not ask questions about his care when Aretha B. spoke to her about him, and although she brought the life insurance certificates to Aretha B., she did not know the correct birthdates of John M. and his sibling.

John M. had been detained from Mother at birth and remained out of her care during the pendency of the case. Mother had never been the primary caregiver for John M., and there was no evidence that John M. was unhappy to be separated from Mother. We conclude Mother failed to show that the benefit to John M. from continuing the relationship with Mother outweighed the benefits he would receive from the permanence of being adopted.

Accordingly, we affirm the juvenile court's order terminating Mother's parental rights as to John M.

## DISPOSITION

The juvenile court's order terminating Camille T.'s parental rights is affirmed. NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


CHANEY, J.

9