Filed 6/2/25  In re A.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.A.,<br><br>    Defendant and Appellant. | E085561<br><br>(Super.Ct.No. J298562)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant A.A.

Tom Bunton, County Counsel, Landon Villavaso, Deputy County Counsels, for Plaintiff and Respondent.

1

# I.

# INTRODUCTION

A.A. (Father) appeals from the juvenile court's order terminating parental rights as to his seven-month-old son Aa.A. (A.). (Welf. & Inst. Code,[1] § 366.26.) Father contends the juvenile court erred in failing to find the sibling relationship exception applied to the termination of parental rights and that the court erred in not adequately addressing a postadoption sibling visitation order.[2] We find no error and affirm.

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Department of Children and Family Services (CFS) in October 2023 after A. tested positive for fentanyl and methamphetamine at his birth and was experiencing withdrawal symptoms. Consequently, A. was placed in the Neonatal Intensive Care Unit (NICU). A.'s withdrawal symptoms included being jittery, having a respiratory rate over 80, a heartrate over 160, and a fever of 100.8 degrees. Mother reported that she began using fentanyl and methamphetamine about a year ago after witnessing an uncle commit suicide. She then began smoking fentanyl six to seven times a day, and then tapered off to smoking it two to three times a day by the end of her pregnancy. Mother also admitted to using methamphetamine two to three times a week throughout her pregnancy. Mother claimed

---

[1] All future statutory references are to the Welfare and Institutions Code.

[2] K.W. (Mother) is not a party to this appeal.

2

that Father had tried to stop her drug use and that Father did not use drugs himself. Father, however, admitted to using fentanyl once a day and methamphetamine two to three times a week during Mother's pregnancy. Father also admitted that he knew Mother used fentanyl and methamphetamine while she was pregnant with his son.

Mother noted that she had another child, V.T.N. (V.), who was six years old at the time with a different father.[3] V. lived with his maternal great-grandmother, Mrs. R., at the time. Mrs. R. did not have legal guardianship over V. or any formal custody arrangement. Mother did not have an address or phone number to contact the maternal great-grandmother. V.'s father did not have contact with V. or support the child in any way. Mother denied having any contact information for V.'s father or his paternal family to locate his whereabouts. Upon concluding its investigation, the children were taken into protective custody.

On October 3, 2023, CFS filed a petition on behalf of the children pursuant to section 300, subdivision (b) (failure to protect). At the detention hearing held on the next day, the juvenile court formally detained the children from parental custody. Mother requested placement of A. with the paternal grandmother who was present in court. The parents were provided with supervised visitation with A. and services pending the jurisdictional/dispositional hearing.

When CFS interviewed Mother again, she admitted to having a substance abuse problem but denied her substance use affected her ability to care for the children, and

---

[3] A.'s half-sibling V. is not a subject of this appeal.

3

assured CFS that the children were her priority. Mother reiterated that she began using drugs two weeks after she lost her uncle to his unexpected suicide and continued to use until she eventually became addicted to fentanyl and methamphetamine. Mother reported using marijuana at the age of 18, cocaine at the age of 24, fentanyl in 2020, and methamphetamine in 2022. By the end of 2020, Mother was smoking fentanyl three times a day at a minimum and last used in October 2023. Mother had been using methamphetamine about three times per month since 2022 and last used methamphetamine in October 2023. Mother admitted to using both methamphetamines and fentanyl during her pregnancy with A. Mother also reported that she and Father used substances together. She explained that V. was at school when she and Father used substances and that V. would be under the care of the maternal grandmother, maternal aunt, or the maternal great-grandmother when she used drugs. On October 4, 2023, Mother submitted an on-demand drug test and tested positive for amphetamines, cocaine, methadone, marijuana, fentanyl, and nor-fentanyl.

When Father was reinterviewed regarding the allegations, Father stated the allegations regarding his substance abuse and his knowledge of Mother's substance abuse were true. He began smoking marijuana at the age of 13 and used it daily around the age of 18. He last used marijuana on September 30, 2023. Father also reported a history of alcohol abuse. He admitted to being arrested for driving under the influence approximately five years ago. Since that time, he continued to drink, but not excessively. Father snorted fentanyl in 2021, and admitted to becoming addicted to it and started

4

smoking it a minimum of three times per day. He last used fentanyl around September 29, 2023. Father further stated that he used methamphetamine in 2021, but did not use it again until 2023 and used it two times a week. He last used methamphetamine around September 20, 2023. Father claimed that he had tried to stop Mother from using drugs while she was pregnant, but admitted to feeling like a hypocrite asking Mother to stop while he was actively using substances. Father also admitted that he used substances while V. was in their care, outside playing, or playing a game on his phone in another room.

Both Mother and Father failed to attend an on-demand drug test on October 17, 2023. CFS recommended suspending in-person visits for the parents until they tested negative for fentanyl three times and requested video-call visits for the parents.

A. was placed in the relative home of the paternal grandmother, Ms. G., after his discharge from the NICU at two weeks old. Ms. G. had been A.'s only placement since being removed from his parents' care. The placement was appropriate, and the caregiver was meeting all the child's needs. A. appeared to be doing well. Ms. G. reported she was able to be a concurrent home for the child if the parents failed to reunify. V. was placed in the relative home of the maternal great-grandmother, Mrs. R. Mrs. R. had been V.'s only placement since he was removed from his parents. V. appeared to be doing well in the placement and in his school. V. did not report any concerns with the placement, and Mrs. R was meeting all the child's needs. Mrs. R. reported she was willing to be a concurrent home placement for V., but was unsure if she would pursue

5

legal guardianship or adoption because she lived in a senior community.  Mrs. R was also assessed to be a placement resource for A.  However, due to V.'s hyperactivity, Mrs. R. felt she would not be able to dedicate enough attention to both children if they were placed in her home together.  Nevertheless, Mrs. R. had good communication with Ms. G., and she displayed an understanding of the need for sibling visitation to allow the children to bond with one another.

The jurisdictional/dispositional hearing was held on November 6, 2023.  Mother was present for the hearing, but Father was not present.  After reading and considering the reports filed by CFS, the juvenile court found true the allegations in the petition, declared the children dependents of the court, and provided the parents with reunification services and supervised visits once a week for two hours with in-person visits to resume once parents tested negative for fentanyl.  The court also ordered supervised sibling visits for the children.

By the six month review hearing in May 2024, the parents' progress in their case plan was minimal and CFS recommended terminating their reunification services. Mother was ordered to complete individual counseling, parenting education, random substance abuse testing, and outpatient substance abuse treatment.  Mother did not submit to drug testing on October 16 and 26, 2023, November 9 and 21, 2023, December 7 and 19, 2023, January 10, 2024, February 21, 2024, March 11 and 19, 2024, and April 10, 2024.  Mother tested positive for illicit substances on October 4, 2023, January 25, 2024, and February 6, 2024.  On October 19, 2023, Mother was referred to individual

6

counseling and parenting education. She attended a few sessions of individual counseling, but stopped participating because transportation and homelessness were issues for her. Mother also attended a few parenting classes, but stopped attending after a few sessions. On December 6, 2023, Mother was referred to Inland Behavioral Health Services Perinatal (IBHS) for outpatient substance abuse treatment. Mother completed the intake on January 10, 2024, and began outpatient substance abuse treatment on January 11, 2024. Mother stopped attending services thereafter due to a miscommunication with the service provider. She reported the coordinator would not let her attend the program if Mother continued to be late, so Mother never returned for classes. Mother later made an appointment with CFS and her substance abuse coordinator to discuss re-enrollment in an outpatient program. Mother was then referred to IBHS and had an intake appointment scheduled for April 22, 2024. CFS made attempts to support Mother by providing her with monthly bus passes, housing resources, and referrals for a parent partner to receive additional support.

Father was ordered to complete individual counseling, parenting education, random substance abuse testing, and an outpatient substance abuse treatment program. On October 17, 2023, Father was referred to random substance abuse testing, but did not submit to testing on October 16, 20, and 24, 2023, November 7 and 15, 2023, December 13, 2023, January 18, 2024, February 1 and 13, 2024, March 7 and 15, 2024, and April 8, 2024. When questioned about his missed tests, Father admitted he thought it would be better to not test than test positive. On October 19, 2023, Father was referred to

7

an individual counseling and parenting education provider. Father initially struggled with consistently attending individual therapy and chose to stop participating. Father also stopped participating in parenting classes, but asked to be reenrolled in parenting education and subsequently received a new referral on April 19, 2024. On December 6, 2023, Father was referred to an outpatient substance abuse program. Father completed the intake appointment on January 11, 2024, and started outpatient substance abuse treatment on January 17, 2024. Father later stopped participating in outpatient services, explaining that Mother paid for him to stay in a hotel so that he could get off the streets and focus on his sobriety. However, Father was unable to maintain his sobriety which resulted in him asking for a referral to either an inpatient program or outpatient services again. On April 10, 2024, Father met with CFS and his substance abuse counselor to discuss being enrolled in an outpatient treatment program. Father was referred to Rialto Behavioral Addiction Treatment Services and had an intake appointment scheduled for April 30, 2024. Father was homeless during the reporting period which was a barrier to completing the court ordered case plan and engaging in visitation. CFS made attempts to support Father by providing him with monthly bus passes and referred him to a parent partner to assist with navigating the child welfare system.

The parents had supervised visits with A. at a CFS office on Tuesdays between 3:00 p.m. and 5:00 p.m. The caregivers, Mrs. R. and Ms. G., supervised the visits and initially reported the parents would take turns caring for A. Mother excelled at parenting A. because she had a child from a previous relationship and supported Father with

learning how to hold, feed, and change A. However, the parents appeared to be under the influence during a supervised visit on February 20, 2024. When questioned, the parents admitted to actively using fentanyl. The parents were then informed that visitation with A. would be discontinued until they were able to provide three consecutive negative test results. As of May 6, 2024, the parents did not provide negative tests to CFS.

A. had weekly visits with his half-sibling brother V. at the home of a relative caretaker. In addition, the relative caretaker provided daycare twice a week for A. while Ms. G. was working. Ms. G. understood the importance of familial connections and expressed a willingness to continue such relationships if it was appropriate and in the best interest of the child. Due to the caregiver engaging with the child and providing him with therapy, A. appeared to be meeting his developmental milestones. A.'s relative caregiver Ms. G. was bonded to A. and she was meeting the child's needs. A. was placed in Ms. G.'s home when he was two weeks old and they had formed a healthy mutual attachment and bond. Ms. G. was willing to provide stability and security to A. and desired to provide him with permanency. A. looked to Ms. G. for love, comfort, and soothing.

The six-month review hearing was held on May 28, 2024. Mother was present for the hearing; Father was not. CFS recommended the juvenile court terminate reunification services for Mother and Father. Mother objected to the setting of a section 366.26 selection and implementation hearing. Father objected to the termination of reunification services and setting of a selection and implementation hearing. Counsel for the child submitted on CFS's recommendation. After reading and considering CFS's reports, the

9

juvenile court terminated reunification services for Mother and Father and set a section 366.26 hearing.

On January 7, 2025, the juvenile court held a section 366.26 selection and implementation hearing. Mother was present; Father was present in custody. Mother requested a continuance to complete reunification services. The juvenile court denied Mother's request. CFS recommended the juvenile court terminate reunification services and select a permanent plan of adoption for A. Father objected to CFS's recommendation without any affirmative evidence and asked the court to consider a lesser plan of legal guardianship and find it's in the child's best interest. Mother also objected to the termination of her parental rights and requested a less restrictive permanent plan of legal guardianship. The child's counsel asked the juvenile court to follow CFS's recommendation. After considering CFS's admitted reports, the juvenile court found that the beneficial parental relationship exception to adoption did not apply, terminated the parents' parental rights, found A. to be both generally and specifically adoptable by clear and convincing evidence, and advised the parents of their appellate rights. Father timely appealed.

III.

DISCUSSION

A. *Sibling Relationship Exception*

Father argues the juvenile court erred in failing to find the sibling relationship exception to adoption applied to the children. CFS responds that because Father did not

10

request the court to consider the sibling relationship exception, he cannot argue on appeal that the court erred by not finding the exception applies in A.'s case. Alternatively, CFS asserts the sibling relationship exception to the termination of parental rights is not applicable in this case.

A parent must raise an exception to the termination of parental rights at the selection and implementation hearing; otherwise, the issue is forfeited on appeal. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 403 (*Erik. P.*).) "If a parent fails to raise one of the exceptions at the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial court's determination is supported by substantial evidence." (*Ibid.*)

We agree with CFS that Father did not raise the sibling relationship exception at the selection and implementation hearing. At the hearing, Father's counsel argued: "On behalf of Father, we would object to the recommendation to terminate parental rights today, without affirmative evidence. I would ask the Court order a lesser plan of legal guardianship and find that it's in the minor's best interest. Submit it." However, Father's counsel never requested the court to find the sibling relationship exception applied to A.'s case. Father's counsel never addressed any of the factors specified in section 366.26, subdivision (c)(1)(B)(v), to argue that termination of his parental rights would cause substantial interference with A.'s sibling relationship, and he did not present, or direct the court's attention to, any evidence that supported applying the exception to A.'s case.

11

(See *Erik P.*, *supra*, 104 Cal.App.4th at p. 403.)  Thus, Father forfeited this issue on appeal.

Even if Father did not forfeit the issue, he has failed to demonstrate the sibling relationship exception applies in A.'s case.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [appellate courts may exercise discretion and excuse forfeiture], superseded by statute on other grounds as stated by *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)  Section 366.26, subdivision (c)(1)(B)(v), provides an exception to adoption where "the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship."  (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 (*Daniel H.*).)  The statute places a heavy burden on the party advocating the exception to overcome the statutory preference for adoption.  (*In re Celine R.* (2003) 31 Cal.4th 45, 61.)  The language of the statute "focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings."  (*Daniel H.*, *supra*, 99 Cal.App.4th at p. 813.)  "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount."  (*In re Valorie A.* (2007) 152 Cal.App.4th 987, 1014.)

"Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship."  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L.*).)  In determining whether the

exception applies, the juvenile court should consider the nature and extent of the sibling relationship, including a child's long-term emotional interest, as compared to the benefit of legal permanence through adoption. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 593.) Section 366.26, subdivision (c)(1)(B)(v), expressly requires the court to consider "whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest." If the court determines terminating parental rights would substantially interfere with the sibling relationship, "[t]he court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer. [Citation.]" (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 951.)

A parent who raises the sibling exception to adoption bears the evidentiary burden of establishing the exception. (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) We review the ruling of the juvenile court for substantial evidence. (*Id.* at p. 291.)

We reject Father's contention that the sibling relationship exception applies in this case. Sufficient evidence supports the juvenile court's determination of adoptability and termination of parental rights. The evidence presented by CFS indicates that A. and V. had little connection or interaction during visits. A. was detained at birth and placed with his paternal grandmother Ms. G. at two weeks old. His half-brother V., who was six

years old at the time A. was born, lived with the maternal great grandmother Mrs. R. Mrs. R. could not accept placement of A. so he remained in the care of Ms. G. Hence, A. was not raised with V. in the same home and there is no indication in the record that they shared significant common experiences or had existing close and strong bonds with each other. CFS had no obligation to create a sibling bond where little or no bond existed. Even though A. and V. had regular and consistent visits, the record does not reflect A., a newborn, had any shared or significant experiences with V. between the date of his birth and the date of the selection and implementation hearing when he was 10 months old. Given the very young age of A. and the six-year age gap between he and V., there is insufficient evidence to show there would be any harm to A. if he lost all contact with V. On the other hand, A. had formed a healthy mutual attachment and bond with Ms. G. A. looked to Ms. G. for love, comfort and support. On balance, the benefits of adoption outweighed the benefit of continuing his relationship with half-sibling V.

"If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*L.Y.L.*, *supra*, 101 Cal.App.4th 942, 952.) Under the circumstances of this case, there was insufficient evidence to establish the sibling relationship exception to the termination of parental rights.

B. *Postadoption Contract for Visitation Between the Siblings*

Father also contends that the juvenile court erred in not adequately addressing postadoption sibling visitation. Father relies primarily on sections 16002, which provides

14

that if parental rights are terminated and the child is to be placed for adoption, CFS "shall" take certain steps "to facilitate ongoing sibling contact." (*Id.*, subd. (e).) Father also relies on section 366.29, which similarly promotes the continuation of sibling relationships by recognizing that prospective adoptive parents can agree to voluntary contracts to "facilitate postadoptive sibling contact," which may be enforced provided it "is in the best interest of the child." (*Id.*, subds. (a), (c)(2).) Father asks us to remand the matter for a hearing "to deal with preserving sibling visitation."

Initially, we note Father does not have standing to challenge the lack of postadoption sibling visitation. "Generally, parents can appeal judgments or orders in juvenile dependency matters. [Citation.] However, a parent must also establish [he or] she is a 'party aggrieved' to obtain a review of a ruling on the merits. [Citation.] Therefore, a parent cannot raise issues on appeal from a dependency matter that do not affect [his or] her own rights. [Citation.] Standing to appeal is jurisdictional." (*In re Frank L.* (2000) 81 Cal.App.4th 700, 703 (*Frank L.*).)

Postadoption sibling visits are a concern of the children, not of a parent whose rights have been terminated. Accordingly, although a child's siblings have standing to enforce section 16002 (*In re Clifton B.* (2000) 81 Cal.App.4th 415, 427 (*Clifton B.*)), a parent whose rights have been terminated does not. (*Frank L.*, *supra*, 81 Cal.App.4th at p. 703; *Clifton B.*, at p. 427; *In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1561-1562.) Once parental rights are terminated, the parent has no more legally cognizable interest in the proceeding or in the children's visitation plans than would a stranger. Standing

15

depends on the nature of the party's interests. Sibling visitation simply does not affect the parent's interests once parental rights are terminated. (*Daniel H.*, *supra*, 99 Cal.App.4th at p. 810; see *Frank L.*, at p. 703.) Father therefore lacks standing to assert the postadoption sibling visitation claims.

Even if Father did have standing, we would reject his contentions.

Section 16002 reflects the legislative policy in favor of maintaining the continuity of the family unit and strengthening family ties by ensuring that siblings be placed together when removed from their homes. (§ 16002, subd. (a).) Thus, the agency is required to "make a diligent effort" in all out-of-home placements to maintain sibling relationships. (§ 16002, subd. (b).) In this regard, if siblings are not placed together in the same home, the social worker is required to "explain why the siblings are not placed together and what efforts" he or she is making to place the siblings together or why those efforts are not appropriate. (§ 16002, subd. (b).) Further, when placement of siblings together in the same home is not possible, diligent effort is required to provide for ongoing and frequent interaction among siblings. (*Ibid.*)

The statute expresses a legislative goal but does not create a mandatory duty. (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 641-642.) It simply requires "diligent efforts." Such efforts were made in this case. CFS had attempted to place A. with V.'s relative caretaker, Mrs. R. However, the hyperactivity of V. was a concern for Mrs. R. As such, Mrs. R. declined placement of A., who was only two weeks old when he was released from the NICU and ten months old at the time of the

16

section 366.26 hearing. Mrs. R. believed she would not be able to dedicate enough attention to both children if they were placed in her home together. CFS spoke to both Ms. G., the caregiver for A., and Mrs. R., to confirm the caretakers had good communication and displayed a mutual understanding of the need for sibling visitation to allow the children to bond with one another. As a result, A. had weekly visits with his half-brother V. at the home of a relative caretaker. In addition, the relative caretaker provided daycare twice a week for A. while Ms. G. worked, and Ms. G. understood the importance of familial connections and expressed a willingness to continue such relationships if it was appropriate and in the best interest of the child. CFS had explored the option of placing A. in the same home as his half-brother; however, the half-sibling's prospective adoptive parent was unable to take A. Contrary to Father's contention, appropriate steps were taken to attempt to place the children together and to facilitate visitation.

The record before us demonstrates CFS made "diligent efforts" to keep the children together and to maintain sibling visitation. The fact there were difficulties was not the fault of CFS. In any event, at no time prior to the section 366.26 hearing did either Father or Mother object to the placements or the lack of consistent sibling visitation. Thus, any error was waived. (*In re Anthony P.* (1995) 39 Cal.App.4th 635, 641-642.) In *Anthony P.*, the court held that "[a]ppellant has waived her right to assert error as to sibling visitation on appeal by not properly raising the issue below. No objection was interposed in superior court premised upon: the alleged failure to

'maintain[] sibling togetherness and contact' (§ 16002, subd. (b)); the purported failure to 'provide for ongoing and frequent interaction among siblings until family reunification is achieved' (§ 16002, subd. (b)); or the supposed failure to state reasons for the suspension of sibling interaction. (§ 16002, subd. (c).) Hence, any objection to the absence of an order providing for sibling visitation has been waived." (*Anthony P.*, at p. 641.)

Father also claims that the juvenile court failed to make an order for sibling visitation following the termination of parental rights, citing *Cliffton B.*, *supra*, 81 Cal.App.4th 415. In *Cliffton B.*, the court referred to the statutory provisions dealing with sibling contact after parental rights are terminated. (§ 16002, subd. (e).) That section only requires DPSS to take steps to facilitate ongoing sibling contact and to educate adoptive parents on the importance of such ongoing contact. (§ 16002, subd. (e).)[4] Nothing in the statute imposes a mandatory duty on the court to order sibling visits, notwithstanding the legislative policy.

---

[4] Section 16002, subdivision (e), provides that, "[i]f parental rights are terminated and the court orders a dependent child or ward to be placed for adoption, the county adoption agency or the State Department of Social Services shall take all of the following steps to facilitate ongoing sibling contact . . . : [¶] (1) Include in training provided to prospective adoptive parents information about the importance of sibling relationships . . . and counseling on methods for maintaining sibling relationships. [¶] (2) Provide prospective adoptive parents with information about siblings of the child. . . . [¶] (3) Encourage prospective adoptive parents to make a plan for facilitating postadoptive contact between the child . . . and any siblings. . . ."

Section 366.29, subdivision (a), provides: "When a court . . . orders that a dependent child be placed for adoption, nothing in the adoption laws of this state shall be construed to prevent the prospective adoptive parent or parents of the child from expressing a willingness to facilitate postadoptive sibling contact. With the consent of the adoptive parent or parents, the court may include in the final adoption order provisions for the adoptive parent or parents to facilitate postadoptive sibling contact. . . ."

Decisional law holds that the sibling relationship is unaffected by a termination of the parent/child relationship. (See *In re Miguel A.* (2007) 156 Cal.App.4th 389, 394.) Thus, so long as the dependency case remains open (until the adoption is finalized), the child's counsel can seek orders for sibling visitation. Neither the provisions of section 16002, subdivision (e), nor section 366.29 imposes any obligation upon the juvenile court to enter orders for sibling visitation. In *Cliffton B.*, *supra*, 81 Cal.App.4th 415 is inapposite. The case does not hold that the failure to order post-termination sibling visitation is error; rather, it states that the juvenile court has discretion to make interim visitation orders but does not make it mandatory to do so or reversibly erroneous to decline.

To the extent that Father focuses on the court's failure to affirmatively order sibling visitation in the interim between the termination of parental rights and the adoption, he has failed to demonstrate any error. As noted, sections 16002, subdivision (e), and 366.29 address postadoptive sibling contact. The court was not obligated to make provisions for such contact. A. and his prospective adoptive parent was amenable to consensual sibling contact with V. Nothing in the court's orders interfered with any such arrangement. In any case, no one requested interim, as opposed to postadoptive, visitation. First, he waived the visitation issue by failing to raise it with the juvenile court before his parental rights were terminated. Father never objected to the court's failure to take the steps articulated in section 16002, subdivision (e). Hence, any objection to the absence of an order providing for sibling visitation has been waived.

19

(*Anthony P.*, *supra*, 39 Cal.App.4th at p. 641.)  The court can hardly be faulted for failing to order what was never requested.

## IV.

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RAPHAEL
J.