Filed 1/15/14  In re Amari E. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re AMARI E., et al., Persons Coming Under the Juvenile Court Law. | B250140 |
| | (Los Angeles County Super. Ct. No. CK88576) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　　Plaintiff and Respondent.<br><br>　　　v.<br><br>JOANMELY M.,<br><br>　　　　Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  D. Zeke Zeidler, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel for Plaintiff and Respondent.

Appellant Joanmely M. (mother) appeals from the juvenile court's order terminating parental rights over her daughters Amari (born November 2006) and Amelia (born July 2009). Mother contends the order must be reversed because the parental exception to terminating parental rights set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) applies.[1]

Substantial evidence supports the juvenile court's finding that no exception to terminating parental rights applied in this case. We therefore affirm the juvenile court's order.

## BACKGROUND

**Detention and section 300 petition**

On June 30, 2011, the Los Angeles County Department of Children and Family Services (the Department) received a referral stating that mother and Mark E. (father)[2] had engaged in a physical altercation in the presence of the children the previous day. Both parents were arrested, and a paternal uncle, Carlos E., was caring for the children.

Four-year-old Amari told the Department's social worker that she saw father hit mother in the face and both parents throw objects at each other. Father told the social worker that mother had gone camping without informing him and that when she returned, an argument ensued and mother began throwing things at him. According to father, mother had a pattern of leaving the home without informing him. He said that a similar incident had occurred in August 2010 when mother became angry and starting hitting him when he questioned her about her whereabouts. Father said he had found methamphetamine among mother's belongings and suggested that methamphetamine use might be a reason for mother's aggressive behavior.

On July 6, 2011, the Department filed a section 300 petition on behalf of the children alleging that mother and father engaged in physical altercations in the children's

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

presence, that mother abused methamphetamine, and that father failed to protect the children.

Both parents appeared at the July 6, 2011 detention hearing at which the juvenile court ordered the children detained and placed with paternal uncle Carlos E. The juvenile court accorded both parents family reunification services and monitored visits at least two times a week.

**Jurisdiction and disposition**

In an August 2011 jurisdiction/disposition report, the Department summarized interviews its dependency investigator had conducted with Amari, father, mother, and other family members. Amari said that mother and father were fighting a lot. They fought because mother took so long to come home and father hit her in the face. She said she had written both parents a letter asking them to stop fighting.

Carlos, with whom Amari and Amelia were placed, stated, "I'm here as long as they need me. I will continue to take [care] of them and make sure that they are safe and happy." Carlos's girlfriend Rachel stated, "I just want them to have a chance in life to reach their full potential and be kids. I love them very much." Carlos told the social worker that when the children were initially placed with him, Amelia would wake up with nightmares, but that she now sleeps through the night. Amari initially cried and became anxious when separated from Rachel.

Father told the social worker that he and mother had argued when she returned from a week-long camping trip and father asked where she had been. Mother began throwing things at him, screaming at him, and threatening to take the children from him. The children were screaming and covering their ears. He called 911 and the police responded and arrested him on an outstanding warrant for a previous domestic violence incident in 2010. During the previous incident, father had pushed mother to the floor after mother scratched and hit him. He was arrested after a neighbor called the police.

Mother admitted throwing a cell phone at father and said father starting hitting her in the face while the children were present. Mother reported that father had been arrested in August 2010 for domestic violence after choking her and hitting her in the face and

3

body while she held Amelia. Mother admitted trying methamphetamine once or twice but denied using it on a daily basis. She admitted using "crystal meth on the second day of [my] camping trip [on] June 27, 2011." Mother enrolled in a domestic violence program on August 1, 2011. Mother produced a negative drug test on July 11, 2011, but failed to appear for testing on July 19 and August 1, 2011.

At the August 11, 2011 jurisdiction/disposition hearing, both parents pleaded no contest to an amended section 300 petition, which the juvenile court sustained. The court declared the children to be dependents of the juvenile court and ordered them removed from their parents' custody. The court ordered mother to participate in a drug and alcohol program with aftercare, drug and alcohol testing, parent education, domestic violence counseling, and individual counseling to address all case issues. Both parents were accorded family reunification services and monitored visits.

**Six-month review proceedings**

In February 2012, the Department reported that Amari and Amelia remained placed with Carlos and Rachel, who provided the children with a safe and stable home and ensured the children's needs were met on a consistent basis. The children were thriving in their current placement. The caregivers reported that the children were happy, interactive, and liked to play with other children. Amari was enrolled in kindergarten and doing well in school. She was recognized as student of the month in January. Between July and December, Amari had attended weekly counseling sessions that had been terminated successfully. The caregivers reported, however, that Amari missed mother and often woke in the middle of the night asking for her. Amari also isolated herself or became quiet after visits with mother. In light of these issues, the caregivers requested that Amari continue in individual counseling.

Mother had enrolled in parenting, domestic violence, and individual counseling at Prototypes Center and had completed six hours of domestic violence education, four hours of parenting, two hours of self esteem support groups, 12 hours of group therapy and one hour of individual therapy. She had not enrolled in any drug or alcohol program and had failed to produce weekly random drug tests. Mother said she appeared at the

testing center but was unable to produce a urine sample while another person was present in the room and watching her. She said she would discuss the issue with her attorney to determine whether there was an alternative means for producing a testing sample.

Mother visited regularly with the children and communicated well with them. Her visits took place at the caregivers' home for four hours on Fridays and Sundays. During the visits, mother's activities with the children included cooking, playing, dancing, singing, reading, and going to the park. She also bathed the children and helped Amari with homework. Mother always brought food and clothes for the children. In November, she took the children, accompanied by their caregivers, to Disneyland to celebrate Amari's birthday.

At the February 9, 2012 hearing, the juvenile court found mother and father to be in partial compliance with their case plans and continued their reunification services.

**Twelve-month review proceedings**

In August 2012, the Department reported that Amari and Amelia were thriving under the care of Carlos and Rachel, who ensured the children's needs were met on a consistent basis and provided the children with a safe and stable home. Carlos was willing to provide a permanent home for the children by becoming their legal guardian.

Amari continued to do well in school and her teacher reported that she was a pleasure to have in class. She still missed mother but no longer woke during the night to ask for her. Amari's behavioral changes after visits with mother had also diminished.

Mother had had very limited contact with the Department since the last hearing date. She was no longer participating in services and had not produced any random drug and alcohol test results. Her file at Prototypes was closed in November 2011 for lack of attendance. When the social worker was finally able to contact mother in July 2012, mother disclosed that she was living in a friend's garage because her parents were no longer willing to help her. Mother admitted she had been avoiding contact with the Department because she was struggling and she did not want the Department to question her ability to care for the children. She said she loved the children and wanted them returned to her custody. Mother continued to visit the children at the caregivers' home

5

for four hours on Fridays and Sundays. She shared a strong bond with the children and interacted appropriately with them.

Both parents appeared at the September 6, 2012 hearing at which the juvenile court found them to be in partial compliance with their respective case plans, terminated family reunification services, and set a section 366.26 hearing.

At an October 3, 2012 progress hearing, the Department informed the juvenile court that Carlos and Rachel were willing to adopt the children. The caregivers had previously requested legal guardianship rather than adoption because they did not want mother and father to think they were trying to take the children away from the parents.

**Section 366.26 proceedings**

In reports submitted to the juvenile court for the January 2, 2013 section 366.26 hearing, the Department reported that Carlos and Rachel continued to express their commitment to adopting the children and providing a permanent home for them. The caregivers explained they had previously considered legal guardianship because they had seen the parents making an effort to take a more active role in the children's lives and did not want the parents to lose the opportunity to reunify with the children.

The adoption social worker informed the juvenile court that Carlos and Rachel were in the process of submitting the required documentation for the adoption home study. The couple was engaged to be married, and according to the adoption social worker, "very capable of meeting the needs of Amelia and Amari both emotionally and financially." The adoption social worker further reported that during the 18 months Amari and Amelia had been placed with Carlos and Rachel the children had become strongly attached to them and were an integral part of their family. Both children demonstrated a strong emotional attachment to Carlos and Rachel and regularly sought them out for reassurance.

**Section 388 petition**

On January 2, 2013, mother filed a section 388 petition seeking return of the children to her custody, or alternatively, reinstatement of reunification services. She alleged she had completed parenting classes and a substance abuse program, as well as

6

individual counseling with Susan Winton, a marriage and family therapist. Mother attached to her petition a letter dated December 14, 2012, from Susan Winton, who opined that mother had "made remarkable progress" and was completing her court mandated programs. Also attached to mother's petition was a letter dated November 19, 2012, from Emily Chapa, a mental health services/substance abuse counselor at Homeboy Industries stating that mother had enrolled in the mental health and substance abuse program that same day.

The juvenile court set mother's section 388 petition for hearing and continued the section 366.26 hearing for completion of the adoption home study. The court granted the Department discretion to liberalize mother's visits.

In a January 29, 2013 report addressing mother's section 388 petition, the Department advised the juvenile court that it had been unable to verify mother's participation in services with Susan Winston and with Homeboy Industries because neither service provider had responded to telephone messages left by the social worker. The Department was also unable to verify mother's completion of an online parenting program, and mother had provided no evidence of participation in weekly random and on demand drug and alcohol testing.

At the February 5, 2013 hearing on mother's section 388 petition, the juvenile found that mother's requested changes were not in the children's best interests and denied the petition.

**Section 366.26 hearing and termination of mother's parental rights**

In its April 2013 section 366.26 report, the Department informed the juvenile court that Amari and Amelia had developed a "strong emotional attachment" to Carlos and Rachel and that the children sought them out for reassurance. The adoption social worker observed the caregivers to be warm, loving, and nurturing, and the children were thriving in their care. Carlos and Rachel declined to participate in a post-adoption contract but said they were willing to allow ongoing contact between the children and the parents as long as the parents were appropriate.

Both parents continued to visit the children frequently several times a week and on weekends. Mother had a "loving relationship" with the children, and the children looked forward to her visits.

In a last minute information for the court filed on April 30, 2013, the Department informed the juvenile court that an adoption home study had been approved for Carlos and Rachel and recommended that the court terminate parental rights. The juvenile court continued the matter for a contested hearing.

At the May 21, 2013 contested section 366.26 hearing, mother testified that she had visited with the children two to three times a week for up to four hours a visit for the past year. All of the visits took place at the caregivers' home. She said the children were happy to see her and "really sad" when the visits ended -- Amelia "cries a lot when I leave." Mother acknowledged that the children had been out of her care for nearly two years and that all of her visits had been monitored.

Mother testified that during visits she would talk to and play with the children, eat meals with them, help Amari with her homework, and prepare the children for bed. She cooked for them on special occasions and sometimes brought clothes and gifts. Mother attended Amari's school functions when invited by the caregivers but did not accompany the children to their doctor's appointments. She said the children called her "mommy" or "momma" and referred to Rachel as "nina" and Carlos as "nino."

At the conclusion of mother's testimony, her attorney asked the juvenile court to order legal guardianship rather than adoption, arguing that mother's visits might be discontinued after the adoption and that it would be detrimental for the children to lose contact with her.

The juvenile court observed that during the two-year duration of the case, Amelia had spent nearly as much time out of mother's care as she had in mother's care, and mother had not progressed beyond monitored visits with the children. The court further noted that while mother had some parental role during the visits, helping Amari with homework, eating meals with the children, and preparing them for bed, she only saw the children for three to five hours at a time. The court concluded that mother's relationship

8

with the children did not outweigh the benefits of permanence that adoption would provide.

The juvenile court found by clear and convincing evidence that Amelia and Amari were likely to be adopted, identified adoption as the permanent plan, and terminated parental rights. The court granted the caregivers discretion to permit ongoing contact between the children and the parents. This appeal followed.

## DISCUSSION

### I. Applicable law and standard of review

Section 366.26, subdivision (c)(1), provides for the termination of parental rights if family reunification services have been terminated and the juvenile court finds by clear and convincing evidence that the child is likely to be adopted. Once reunification services have been terminated, "'[f]amily preservation ceases to be of overriding concern . . . the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citations.]'" (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195.) "Adoption, where possible, is the permanent plan preferred by the Legislature. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Although the statutory preference is in favor of adoption, section 366.26 lists certain exceptions that may preclude termination of parental rights, if the juvenile court finds "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)

The juvenile court's ruling on whether an exception applies to terminating parental rights pursuant to section 366.26 is reviewed under the substantial evidence standard. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; *Autumn H., supra*, 27 Cal.App.4th at p. 576.) Under this standard, an appellate court must affirm the juvenile court's order if there is evidence that is reasonable, credible, and of solid value to support the order (*In re Christina A.* (1989) 213 Cal.App.3d 1073, 1080), and the evidence must be considered "in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Autumn H.*, at p. 576.)

9

Mother contends the juvenile court should have ordered legal guardianship rather than adoption as the permanent plan because the exception to terminating parental rights set forth in section 366.26, subdivision (c)(1)(B)(i) applies. That exception provides as follows: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

The parent bears the burden of proving that this exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) "[T]he exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

For the exception to apply, the parent must have maintained regular visitation with the child, and the juvenile court must determine that the parent/child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) A parent must establish more than merely some benefit to the child by continuing the parent/child relationship. That relationship must be "a substantial, positive emotional attachment such that the child would be greatly harmed" if the relationship were severed. (*Ibid.*) To overcome the benefits associated with a stable, adoptive family, the parent seeking to continue a relationship with the child must prove that severing the relationship will cause not merely some harm, but *great harm* to the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.) Factors that the juvenile court should consider when determining the applicability of the exception include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Autumn H., supra*, at p. 576.)

## II. Substantial evidence supports the juvenile court's findings

Substantial evidence supports the juvenile court's determination that the parental exception to terminating parental rights did not apply. Amari was four years old and Amelia 23 months old when the children were detained from mother's custody. When mother's parental rights were terminated, Amari and Amelia were six and three years old, respectively, and Amelia had spent half of her life in Carlos's and Rachel's care. The caregivers were committed to adopting the children and to providing a loving, safe, and stable home for them. Amari and Amelia thrived in their caregivers' home. The children demonstrated a strong emotional attachment to Carlos and Rachel and often sought them out for reassurance. Although the children initially exhibited distress and anxiety during the early months of their separation from mother, these issues diminished over time.

It is undisputed that mother visited regularly with the children, and that she and the children shared a substantial, positive relationship. Mother argues that section 366.26, subdivision (c)(1)(B)(i) requires only that she show that the children would benefit from continuing that relationship and that "[t]he court is not to balance the detrimental or beneficial consequences or look to whether there would be an additional benefit from the decision to terminate parental rights." Her argument misstates the applicable standard. The existence of "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) In determining whether the parent/child relationship gives rise to an exception to terminating parental rights, the juvenile court must determine that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) To demonstrate that the parent/child relationship exception applies, "the parent must show more than that the relationship is 'beneficial.'" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52, fn. 4.)

11

In the instant case, the juvenile court expressly found that the benefits of continuing mother's relationship with the children did not outweigh the benefits and permanence of adoption.  Before their placement with Carlos and Rachel,  Amari and Amelia witnessed incidents of domestic violence that were triggered by mother's absences from the home and that were exacerbated by mother's drug use.  During the 22-month duration of the case, mother lacked stable housing, failed to complete a substance abuse treatment program, failed to participate in court ordered drug and alcohol testing, failed to maintain regular contact with the Department's social worker, and failed to progress beyond supervised visits with the children.  With their prospective adoptive parents, Amari and Amelia were thriving in a safe, stable, loving, and nurturing home.  Substantial evidence supports the juvenile court's determination that mother failed to establish that the exception set forth in section 366.26, subdivision (c)(1)(B)(i) precluded the termination of her parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.*
FERNS


_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12