Filed 10/1/14  In re Sean T. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SEAN T., a Person Coming Under the Juvenile Court Law. | B254583 |
| | (Los Angeles County Super. Ct. No. CK88494) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| PATRICIA F., et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed as to Patricia F.; dismissed as to Sean T.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant Patricia F.

Neal B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant Sean T.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tracey F. Dodds, Deputy County Counsel for Plaintiff and Respondent.

Patricia F. (mother) and Sean T. (father) appeal from the juvenile court's order terminating parental rights over their son Sean (born April 2007). We dismiss father's appeal and affirm the order terminating mother's parental rights.

## BACKGROUND

**Detention and section 300 petition**

On June 3, 2011, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging that Sean was a victim of emotional abuse by mother, who had untreated mental health problems. Mother had been evaluated on May 27, 2011, after exhibiting psychotic symptoms. She had reportedly burned papers in her bedroom while Sean was present and kicked maternal grandmother Cecelia T. (maternal grandmother). Mother had not been hospitalized because she had agreed to seek psychiatric treatment. She later refused to do so.

Mother initially presented well during a June 3, 2011 interview with the Department's social worker at the home mother shared with maternal grandmother and maternal great-grandmother. As the interview progressed, however, mother began exhibiting symptoms of paranoia. She admitted suffering a "breakdown" in November or December of 2010 and being hospitalized approximately six years ago, but denied having any current mental health issues. Mother said she had been prescribed medication but refused to take it because it had not worked in the past.

The social worker spoke with a Department of Mental Health mobile response team worker named Andrea Simmons, who had visited the family on May 27, 2011, at maternal grandmother's request. Mother was very agitated that day and was refusing to take her prescribed psychotropic medication. She agreed to seek treatment. When Simmons later followed up with the family, mother had not obtained treatment and was still exhibiting paranoid symptoms. Simmons called in the referral to the Department after she witnessed an altercation between mother and maternal grandmother and mother threatened to leave the home with Sean.

The social worker also spoke with Alison Manumaleuna, a case manager with Children's Institute International who had been working with mother since April 2011.

Manumaleuna said that approximately two weeks earlier, mother was exhibiting signs of depression after not sleeping for three days. Manumaleuna took mother to see a psychiatrist and then accompanied mother to obtain her prescribed medication. Mother refused to take the medication.

The social worker, accompanied by Simmons, met with mother and maternal grandmother on June 23, 2011. Maternal grandmother confirmed that mother had attempted to start a fire in her bedroom while Sean was present. She said that at times mother does not get out of bed or leave the house and that mother had failed to keep multiple doctor appointments for Sean. Simmons attempted to persuade mother to seek treatment through the Department of Mental Health. Mother refused to do so and stated several times that she would not take her prescribed medication.

Mother appeared to be in an active psychotic state during a team decision meeting held on June 24, 2011. She referred several times to a book entitled "The Game" as the source of her problems, but she could not coherently explain how or why this was the case. Mother agreed during the meeting that she would take her prescribed psychotropic medication; however, she subsequently failed to do so.

On June 29, 2011, the Department filed a petition on behalf of Sean under Welfare and Institutions Code section 300, subdivisions (a), (b), and (g),[1] alleging that mother had a history of engaging in violent altercations with maternal grandmother and had kicked maternal grandmother on a prior occasion in May 2011; that mother had mental and emotional problems rendering her incapable of providing Sean with regular care and supervision; that mother created a detrimental and endangering situation by attempting to start a fire in the home in the child's presence; and that mother had a history of illicit drug use, including marijuana, rendering her incapable of providing Sean with regular care and supervision. The petition further alleged that father, whose whereabouts were unknown, had failed to provide Sean with the necessities of life.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

The juvenile court ordered Sean detained from mother and placed with maternal grandmother. The court also issued a statewide jail removal order for father.

In July 2011, the Department reported that mother had been admitted to Pacific Hospital on July 9, 2011, and discharged on July 15, 2011. Mother refused assistance with housing and said she was going to her cousin's home. The Department's social worker obtained the cousin's telephone number from maternal grandmother and left a message asking mother to contact the Department. Mother did not call, and her whereabouts were then unknown.

Mother appeared at a July 20, 2011 hearing at which the juvenile court found father to be an alleged father. The court ordered mother to sign a release order with regard to her medical information and ordered the Department to prepare a report addressing mother's mental health issues.

**Jurisdiction and disposition**

The Department's August 12, 2011 jurisdiction/disposition report summarized interviews involving the social worker and mother, maternal grandmother, mother's therapist, and father.

Mother said she was diagnosed with psychosis when she was 21 or 22 years old and was hospitalized for four days. Discharge documents from mother's July 2011 hospitalization indicated diagnoses of depression and bipolar disorder, and recommended that mother find a stable and structured living arrangement and that she continue to take her prescribed medications. Mother said she had stopped taking medication because "it was messing me up." Mother admitted to occasional marijuana use in the past but said she had not used marijuana for at least a year. With regard to the alleged incident of domestic violence, mother said she had kicked maternal grandmother after maternal grandmother slapped mother in the face. She said Sean was not present during the altercation. Mother denied setting any fires in the home and said she had been using matches to light a candle. Mother said that father had been incarcerated since she was four months pregnant, her relationship with him ended upon his incarceration, and she did not know when he would be released.

4

According to maternal grandmother, mother had been diagnosed with psychosis, depression, and bipolar disorder and had been prescribed two different medications. She said that mother was in denial about her illness and believed the medication was unnecessary. Maternal grandmother said the domestic violence allegation was untrue. She said that mother had kicked her in the leg on one occasion outside of Sean's presence and there had been no other physical altercations between them. Maternal grandmother said she had not witnessed mother setting fire to anything in the home but at the time could smell burning paper. Maternal grandmother stated she had never met father and that father had never provided any support for Sean.

Mother's therapist, Dr. Peter Jay, said that he had seen mother on July 18 and 21, 2011. Mother presented as paranoid on July 18, and was "confused, suspicious, and argumentative" on July 21. He said that mother continues to appear psychotic.

Father spoke with the social worker by telephone. He said he was unaware of any physical altercations between mother and maternal grandmother, mother's mental or emotional health issues, or mother's alleged drug use. He said he had been incarcerated since 2006 as the result of a firearms conviction and that his expected release date was sometime in 2016.

Father appeared at a hearing held August 10, 2011, and denied the allegations of the petition. The juvenile court ordered the Department to arrange a team decision meeting with the paternal and maternal relatives to address visitation issues.

Mother and father were both present at the August 12, 2011 jurisdiction and disposition hearing at which mother submitted to an amended petition and pled no contest to allegations that she had been diagnosed with psychosis and bipolar disorder, limiting her ability to provide regular care and supervision for Sean, that she sometimes failed to take her prescribed psychotropic medication, placing him at risk of harm, and that she and maternal grandmother engaged in a verbal and physical altercation while Sean was in the home. The juvenile court declared Sean to be a dependent of the court and ordered him removed from mother's custody. The court ordered mother to participate in individual counseling to address case issues, including her relationship with maternal

5

grandmother, parenting, and drug counseling; to take all prescribed psychotropic medications; to follow up with the Department of Mental Health; to submit to six random or on demand drug tests; and to participate in a drug rehabilitation program if any drug tests were positive. The court accorded mother monitored visits, as often as could be arranged, and gave the Department discretion to liberalize the visits.

The juvenile court denied father reunification services pursuant to section 361.5, subdivision (a) and accorded him monitored visits once a month after consultation with minor's counsel.

## Review proceedings

In February 2012, the Department reported that Sean was doing well in maternal grandmother's care. He was enrolled in preschool and attended group therapy. Maternal grandmother said she was committed to caring for Sean and wanted Sean to remain with her if he could not return to mother.

Mother was in partial compliance with her case plan. She was meeting with her psychiatrist on a regular basis and was taking her prescribed medications. She also visited consistently with Sean, who appeared excited and happy to see her. However she had not completed random drug testing, was not currently enrolled in a substance abuse treatment program, and had not attended individual therapy on a regular basis.

Sean had not visited with father because neither father nor father's counsel had requested visitation.

In August 2012, the Department reported that Sean was thriving under maternal grandmother's care. He was attending therapy and maternal grandmother was completing a parenting program to help manage Sean's sometimes aggressive behavior. Sean's behavioral issues worsened after some visits with mother.

Mother continued to have weekly monitored visits with Sean. She also had unscheduled visits at maternal grandmother's home where she often appeared unannounced. Maternal grandmother described mother's visits as "up and down." Some visits went well, but when Sean acted out and mother had difficulty handling his aggressive behavior the visit was not successful. Mother also became upset and

6

argumentative when maternal grandmother asked her not to discuss case issues with Sean or to use physical discipline. Sean told the social worker that he enjoyed seeing mother but that sometimes mother did not play with him and spanked him during visits.

Given the ongoing conflict between mother and maternal grandmother, the social worker arranged for mother's visits to take place at the Department's offices. A monitored visit at the Department's offices on August 8, 2012, went well. Mother was affectionate and appropriate with Sean. Sean enjoyed the visit and did not want mother to leave when it ended.

Mother continued to be in partial compliance with court orders. She had completed parenting and anger management classes and was attending a substance abuse program. She failed, however, to appear for random drug testing and did not regularly attend individual therapy sessions. Mother told the social worker that she had stopped taking her prescribed medication, except for her anxiety medication.

At the August 10, 2012 review hearing, the juvenile court ordered Sean to remain placed with maternal grandmother and ordered continued reunification services for mother. The court ordered the Department to assist mother in enrolling in a hands-on parenting class and accorded the Department discretion to liberalize mother's visits in a child-centered neutral setting.

In January 2013, the Department reported that Sean continued to thrive in the care of maternal grandmother, who was willing to adopt him if he could not be returned to mother. Sean appeared happy, comfortable, and well adjusted. His behavioral issues had improved.

Mother completed an outpatient substance abuse program and parenting and anger management classes. She was generally consistent with her random drug testing but was not attending individual therapy sessions on a regular basis. She had stopped taking her prescribed medication. The social worker expressed concerns about mother's stability after maternal grandmother told her that mother had hit Sean with a shoe during an unscheduled visit at maternal grandmother's home.

Mother's monitored visits with Sean had become inconsistent. She missed several scheduled visits and had no visits at all during the month of September 2012. The social worker observed during one monitored visit that Sean behaved aggressively toward mother, trying to hit her with his shoe and then attempting to throw the shoe at her. Mother did not know how to respond to Sean's aggressive behavior, and the social worker had to terminate the visit.

At a January 3, 2013 hearing, the juvenile court ordered the Department to provide a supplemental report on mother's progress in programs and set the matter for a contested selection and implementation hearing.

In March 2013, the Department reported that mother was not in compliance with her court ordered case plan. She was no longer attending individual therapy and had stopped taking her prescribed medication. Mother said she had discontinued her medication because she was pregnant and no longer needed it. Her visits with Sean had been inconsistent, and she cancelled several weeks of visits. The Department recommended termination of reunification services.

In April 2013, the Department reported that Sean continued to thrive in maternal grandmother's care. He exhibited anxiety and aggressive behavior, however, and these issues were being addressed in therapy. Mother had not resumed individual therapy, had not obtained a psychiatric reassessment, and was not taking her prescribed psychotropic medication.

In July 2013, the Department learned that mother was homeless and obtaining financial assistance from maternal grandmother. Mother was still not taking her prescribed medication or attending individual therapy. She missed some monitored visits at the Department's offices, and when she did, she appeared unannounced at maternal grandmother's home asking to see Sean.

Maternal grandmother reported that Sean was experiencing separation anxiety. He did not want to leave maternal grandmother's side after mother told him that she would take him home with her.

8

At a hearing held on July 3, 2013, the juvenile court found that both parents had not consistently and regularly contacted and visited with Sean and had not made significant progress in resolving the problems that led to his removal. The court terminated reunification services and set the matter for a contested section 366.26 hearing.

**Section 366.26 proceedings**

In its October 30, 2013 section 366.26 report, the Department stated that maternal grandmother remained committed to adopting Sean. She had an approved home study. Although Sean had a limited understanding of what adoption meant, he said that he wanted to remain with his grandmother forever.

Father appeared in custody at the October 30, 2013 hearing and requested paternity testing. The juvenile court ordered DNA testing and continued the matter to December 2013 for those test results.

In December 2013, the Department's social worker reported that mother had not maintained contact with her since reunification services were terminated. Mother called the social worker once in November 2013 requesting visitation with Sean but then failed to follow up. Maternal grandmother reported that mother had not visited with Sean since the start of the school year.

A contested section 366.26 hearing was held on January 27, 2014. The juvenile court denied father's request to continue the hearing because father's DNA test results had not yet been received. The court received the Department's reports into evidence and heard testimony from mother, Sean, maternal grandmother, and father.

Mother testified that she had been seeing Sean every day, and that she walked him to school every morning. She also spent weekends with him. Mother said maternal grandmother interfered with the way she disciplined Sean and would not let her into the home.

Sean testified that mother came to see him Friday and Saturday and "sometimes" came to visit him in the morning. He said both mother and maternal grandmother walked him to school. Sean testified that he did not know what it meant to be adopted. When

9

counsel explained to him that if he were adopted, mother would no longer be his mother, Sean said he did not want that because he loved mother and he would be sad if he could never see her again.

Maternal grandmother testified that Sean, who was then six and a half years old, had lived with her his entire life. She said she would allow mother to continue to visit with Sean even if mother's parental rights were terminated, but that she would continue to monitor those visits. Maternal grandmother confirmed that mother came to her home almost daily. She had not allowed mother to visit the previous Friday because mother had put Sean in the closet as a form of discipline.

Father testified that he was incarcerated before Sean's birth and that he would not be released for another 31 months. He last saw Sean in January 2008. He sent cards, letters, and photos when he could. He did not want Sean to be adopted.

At the conclusion of the hearing, the juvenile court found that Sean was adoptable and that returning him to the parents would be detrimental. The court found that the exception under section 366.26, subdivision (c)(1)(B)(i) did not apply and terminated mother's and father's parental rights. This appeal followed.

### DISCUSSION

**I. Father's appeal**

Father's appointed counsel filed a brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, indicating an inability to find any arguable issues. We advised father that he had 30 days in which to submit any arguments he wished us to consider and subsequently accorded him an additional 31-day extension in which to do so. Father submitted a letter brief in which he contends the juvenile court erred by denying him a continuance of the section 366.26 hearing pending the results of a DNA test that would allow him to establish biological and presumed father status and by denying him reunification services based on the length of his incarceration. Father further contends the court erred by terminating his parental rights after all allegations against him had been dismissed and there was no finding that he was an unfit parent.

"An appealed-from judgment or order is presumed correct. [Citation.] Hence, the appellant must make a challenge. In so doing, he must raise claims of reversible error or other defect [citation], and 'present argument and authority on each point made' [citations]. If he does not, he may, in the court's discretion, be deemed to have abandoned his appeal. [Citation.] In that event, it may order dismissal. [Citation.]" (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

Father has established no error in the proceedings below, nor any legal basis for reversal. Substantial evidence supports the juvenile court's conclusion that Sean was adoptable, and that adoption was in the child's best interest. We accordingly dismiss father's appeal.

## II. Mother's appeal

### A. *Applicable law and standard of review*

Section 366.26, subdivision (c)(1), provides for the termination of parental rights if family reunification services have been terminated and the juvenile court finds by clear and convincing evidence that the child is likely to be adopted. Once reunification services have been terminated, "'[f]amily preservation ceases to be of overriding concern . . . the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citation.]' [Citation.]" (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195.) "Adoption, where possible, is the permanent plan preferred by the Legislature. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Although the statutory preference is in favor of adoption, section 366.26 lists certain exceptions that may preclude termination of parental rights, if the juvenile court finds "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)

The juvenile court's ruling on whether an exception applies to terminating parental rights pursuant to section 366.26 is reviewed under the substantial evidence standard. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; *Autumn H., supra*, 27 Cal.App.4th at p. 576.) Under this standard, an appellate court must affirm the juvenile court's order if there is evidence that is reasonable, credible, and of solid value to support the order (*In re*

11

*Christina A.* (1989) 213 Cal.App.3d 1073, 1080), and the evidence must be considered "in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Autumn H.*, at p. 576.)

Mother contends the order terminating her parental rights should be reversed because the exception to terminating parental rights set forth in section 366.26, subdivision (c)(1)(B)(i) applies. That exception provides as follows: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

The parent bears the burden of proving that this exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) "[T]he exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

For the exception to apply, the parent must have maintained regular visitation with the child, and the juvenile court must determine that the parent/child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) A parent must establish more than merely some benefit to the child by continuing the parent/child relationship. That relationship must be "a substantial, positive emotional attachment such that the child would be greatly harmed" if the relationship were severed. (*Ibid.*) To overcome the benefits associated with a stable, adoptive family, the parent seeking to continue a relationship with the child must prove that severing the relationship will cause not merely some harm, but *great harm* to the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.) Factors that the juvenile court should consider when determining the applicability

12

of the exception include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ."  (*Autumn H., supra*, at p. 576.)

### B. *Substantial evidence supports the juvenile court's findings*

Substantial evidence supports the juvenile court's determination that the parental exception to terminating parental rights did not apply.  Mother did not visit consistently with Sean throughout the case.  When her monitored visits with Sean were moved to the Department's offices, mother missed several visits.  She had no visits during the month of September 2012.  She cancelled several weeks of visits during the first few months of 2013.  Mother continued to miss some monitored visits during the summer of 2013, and when she did, she appeared unannounced at maternal grandmother's home asking to see Sean.  She did not visit at all, either at the Department's offices, or at maternal grandmother's home, during most of the fall of 2013.

The quality of mother's visits with Sean was not always positive.  Maternal grandmother described mother's visits as "up and down."  During one unscheduled visit at maternal grandmother's home, mother hit Sean with a shoe.  Two monitored visits at the Department's offices had to be terminated because mother did not know how to respond to Sean's aggressive behavior.  Maternal grandmother refused to allow mother an unscheduled visit during the week preceding the section 366.26 hearing because mother had put Sean in a closet as a form of discipline.

Sean's behavioral issues worsened following visits with mother.  He exhibited separation anxiety and did not want to leave maternal grandmother's side.

Mother argues that Sean's testimony during the section 366.26 hearing that he did not want to be adopted because he loved mother "a lot" was evidence that a strong and beneficial parent-child relationship existed between them.  The existence of "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)  In determining whether the parent/child relationship gives rise to an exception to terminating parental rights, the juvenile court must determine that the relationship "promotes the well-being of the child

13

to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) To demonstrate that the parent/child relationship exception applies, "the parent must show more than that the relationship is 'beneficial.'" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52, fn. 4.)

Substantial evidence supports the juvenile court's finding that the benefits of continuing mother's relationship with Sean did not outweigh the benefits and permanence of adoption by his maternal grandmother. During more than the two and a half year duration of the case, mother lacked stable housing, failed to take her prescribed psychotropic medication, failed to participate in court ordered individual therapy, failed to maintain regular contact with the Department's social worker, and failed to progress beyond supervised visits with Sean. Sean was thriving in the home of his maternal grandmother, with whom he had lived his entire life. Maternal grandmother, in turn, wished to adopt Sean in order to continue to provide him with a safe, stable, loving, and nurturing home. She had allowed mother to have daily visits with Sean throughout the case and she was willing to allow mother to have a continued presence in the child's life. Substantial evidence supports the juvenile court's determination that mother failed to establish that the exception set forth in section 366.26, subdivision (c)(1)(B)(i) precluded the termination of her parental rights.

**DISPOSITION**

Father's appeal is dismissed.  The order terminating parental rights is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.