Filed 6/26/25  In re P.P. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re P.P., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.P. et al.,<br><br>        Defendants and Appellants. | A171814<br><br>(Solano County<br>Super. Ct. No. J45631) |

This is our second opinion in this dependency proceeding involving P.P., the four-year-old son of P.S. (mother) and C.P. (father) (collectively, parents).  When he was almost two years old, P.P. was detained after ingesting methamphetamine.  In our first opinion, we affirmed the juvenile court's jurisdictional and dispositional orders finding that P.P. was a person described by Welfare and Institutions Code[1] section 300, subdivision (b), and removing him from parents' care.  (*In re P.P.* (Oct. 18, 2023, A167129) [nonpub. opn.].)

---

[1] All statutory references are to the Welfare and Institutions Code.

Soon after our first opinion issued, both parents' reunification services were terminated. Subsequently, mother filed a petition under section 388 seeking P.P.'s return to her custody or reinstatement of her services. The juvenile court denied mother's section 388 petition and then terminated her and father's parental rights under section 366.26, rulings from which parents now appeal.

Mother claims the juvenile court applied the wrong legal standard to deny her section 388 petition, requiring reversal of both that ruling and the termination of her parental rights. Mother and father both claim that the court also erred by concluding they did not establish the parental-benefit exception to termination under section 366.26, subdivision (c)(1)(B)(i). We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    *Proceedings Leading to Our Prior Opinion*

The background of this case through the January 2023 jurisdictional and dispositional hearing is set forth in our first opinion. To summarize, P.P. was born in November 2020, at which time mother tested positive for methamphetamine and tetrahydrocannabinol (THC). She had a history of methamphetamine use going back to the early 2000's.

In August 2022, mother brought P.P. to the emergency room because she suspected he had ingested methamphetamine. An initial toxicology screen was presumptively positive for the drug. Mother told a social worker that father and P.P.'s paternal grandmother, with whom the family lived, used methamphetamine. Mother claimed she had been clean from methamphetamine for 12 to 13 years, relapsed in 2017, and used "on and off" until April 2020, when she found out she was pregnant with P.P. Although

2

mother initially claimed she had not used methamphetamine since 2020, she eventually admitted to relapsing two days before she brought P.P. to the hospital. P.P. was removed from parents' care.

The Solano County Health and Social Services Department (Department) filed a petition alleging the juvenile court had jurisdiction over P.P. under section 300, subdivision (b)(1), based on his ingestion of methamphetamine while in parents' care; mother's history of using that drug; and the "filthy" condition of the paternal grandparents' home. The court ordered P.P. detained, and he was placed in a foster home. Parents were ordered to engage in drug testing and allowed to have supervised visits with their son.

A contested jurisdictional and dispositional hearing was held five months later. During that period, mother tested positive for marijuana and amphetamines in late August and early September 2022, and missed all but one of her other scheduled tests. Father tested positive for amphetamines once and missed all other scheduled tests. Parents regularly attended visits, and mother engaged in other services, including a parenting program. The Department recommended that parents receive reunification services.

At the contested hearing in January 2023, parents claimed P.P. ingested the paternal grandfather's medication, not methamphetamine. Evidence was presented that the grandfather sometimes threw his medication on the floor, where P.P. could have accessed it. When mother took P.P. to the emergency room, the hospital did only a presumptive drug test, not a confirmatory one, increasing the possibility of a false positive. P.P. also did not display many of the usual signs of methamphetamine intoxication. Both parents acknowledged relapsing soon after P.P. was removed but otherwise denied recent methamphetamine use.

3

The juvenile court sustained the allegations that P.P. ingested methamphetamine while in parents' care and dismissed the allegations involving the grandparents' home's condition. The court found that out-of-home placement was necessary and ordered reunification services for both parents. The court emphasized that parents were required to submit to random drug tests through the probation department unless other arrangements were approved.

Mother and father appealed from the dispositional order. Father's appellate counsel filed a no-issues statement, and we dismissed father's appeal. We then filed an opinion rejecting mother's claims involving her self-representation at the jurisdictional and dispositional hearing and her argument that inadequate evidence supported the juvenile court's dispositional removal order.

B. *Proceedings Leading to Termination of Parents' Services*

P.P. was moved to a new foster home in November 2022. Less than two months later, the foster family gave notice they no longer wished to have P.P. in their care. The foster agency had inadvertently shared the family's contact information with parents, and the family felt "unsafe and threatened" because "mother was texting and calling the resource mother often." Over mother's objection, P.P. was moved to an out-of-county placement in February 2023.

A March 2023 interim review report stated that parents continued to visit P.P. consistently and the visits were "going well." Mother and father continued to resist drug testing as ordered, and testing through alternative means that met the Department's requirements was still not in place for either parent. At a hearing the following month, mother said she felt like a "prisoner" testing at the probation department and it "[gave] her anxiety."

4

The juvenile court urged her "to test as they are asking you," and mother agreed she could do so.

Mother filed a section 388 petition in April 2023, seeking P.P.'s return to her custody or unsupervised and overnight visits. Mother noted she had begun drug testing through her doctor at Kaiser and submitted a few negative test results. She had also moved out of the paternal grandparents' home into a new residence. In response, the Department emphasized that the testing through Kaiser was not sufficiently monitored. Moreover, even the results mother submitted showed inconsistent testing.

The Department was also concerned about a recent incident of domestic violence between parents. On April 16, 2023, during an argument in the car, father punched mother in the back of the head six times. Mother called the police, and father was arrested. Mother also reported other recent incidents where father had "punched and choked" her. Mother told the social worker she nonetheless planned to stay with father, and she continued to have substantial contact with him. The Department opposed unsupervised visits, much less P.P.'s return to mother, until she "participate[d] in three random and observed tests through Probation with clean results and there is a viable plan to ensure safety from domestic violence with . . . [father]."

After a contested hearing in June 2023, the juvenile court denied mother's section 388 petition.[2] The court stated that its "biggest concern" was mother's failure to engage in monitored drug testing as required. The court told mother, "You've wasted so much time. You have wasted months of time with Kaiser testing and doing something different than the testing that is being requested of you by the Department." The court also stated that

---

[2] Mother appealed from this ruling, and we dismissed the appeal after her counsel filed a no-issues statement. (*In re P.P.* (Dec. 20, 2023, A168484).)

testing through dependency drug court, which mother had also done, was insufficient. The court unambiguously ordered mother "to test with Probation as directed," telling her she would not receive unsupervised visits until she provided negative results from approved testing.

The Department filed a six-month status review report later in June 2023. Parents continued to visit P.P. consistently, with mother reported to be "loving and nurturing" and father's visits reported to be "positive and appropriate." Mother was engaged in parenting classes and substance-abuse meetings, and she was meeting weekly with a therapist. But, as already revealed in connection with her section 388 petition, mother refused to test through the probation department. Specifically, she missed 30 tests between February and May. Father generally refused to follow his case plan, and though he had recently enrolled in parenting classes, he did not participate in drug testing or mental health services. The Department also remained concerned about the recent domestic violence between mother and father.

Despite mother's refusal to drug test and continued relationship with father, the Department judged her progress toward reunification to be adequate. Father, on the other hand, had made minimal progress, and his failure to engage in services made reunification "unlikely." The Department recommended that mother's reunification services be continued and father's services be terminated.

The six-month-review hearing was ultimately continued to late fall and combined with the twelve-month-review hearing. A September 2023 addendum report stated that in July, mother reported she was using methamphetamine every other week and marijuana daily. She tested positive for methamphetamine and THC five times between June and August and missed all her remaining tests. Mother enrolled in an outpatient drug

treatment program but did not attend any of the virtual sessions. She also failed to provide the social worker with verification of her attendance at substance abuse meetings. She did, however, maintain her participation in parenting education and individual therapy. Father drug tested only once, in August, and the test was positive for amphetamines. He had completed a parenting program, and he provided verification of his attendance at substance abuse meetings during the reporting period.

As a result of the April 2023 domestic violence incident, mother and father began visiting separately with P.P. Mother also had short phone visits with P.P. Mother was "very engaged" with her son during visits, and they enjoyed visiting each other. Mother had not missed a single visit except to attend court, and she always completed make-up visits. Father attended most visits, which were usually positive, but he yelled at mother at the end of one of his visits when she would not let him sit in her car while she attended her visit. The Department continued to recommend that mother's reunification services be continued and father's be terminated.

In October 2023, the Department submitted a second addendum report. Mother did not complete any ordered drug tests in September or October, except for one in late October that remained pending.[3] Mother also took two oral swab tests through dependency drug court, one of which was positive for methamphetamine. After some false starts, she enrolled in an outpatient drug treatment program, but she had not begun drug testing through it. She had also stopped individual therapy after "firing" her therapist. Mother continued to have consistent and appropriate visits with P.P.

---

[3] At a later hearing, the social worker testified that the pending test came back positive for methamphetamine and THC.

7

Father was mostly out of contact with the Department since the previous report, although he sent the social worker a few text messages with "inappropriate and aggressive language" complaining about how he was being treated. Father refused to continue drug testing through the probation department, and no further test results were submitted. He also missed several visits with P.P.

The Department now recommended that both parents' reunification services be terminated. Although mother had finally enrolled in a drug treatment program, she did not drug test consistently and had several positive tests. She also continued to "lack . . . insight" about the reasons P.P. entered foster care. Father had participated in services only minimally, and his inappropriate behavior "[made] it difficult to assess his willingness and ability to have his son in his care." There was "no doubt that both parents love[d] their son," but their lack of participation in their case plan left "no substantive probability that if given more time, either parent could safely reunify with [him]."

A contested combined six- and twelve-month-review hearing was held in November 2023. The juvenile court found that the Department had provided reasonable services and that mother's progress toward addressing the causes necessitating out-of-home placement was "minimal" and father's was "none." Parents' reunification services were terminated, and a selection-and-implementation hearing under section 366.26 was set for February 2024. Parents were permitted to continue to visit P.P. on a "titrated" schedule, moving from twice a week to once a month leading up to the section 366.26 hearing.

8

## C. *Proceedings Leading to Termination of Parental Rights*

The Department filed a section 366.26 report in February 2024. The report recommended that mother's and father's parental rights be terminated and adoption be P.P.'s permanent plan. P.P. had been in his current placement only since late December 2023, but the foster family was interested in adopting him. Mother continued to visit P.P. regularly and appropriately. The Department was concerned that she was back to living at the paternal grandparents' home and continued to have a relationship with father. Although mother claimed she was drug testing at dependency drug court, she still had not randomly drug tested through the probation department as required. Father, meanwhile, had mostly been out of contact with the Department and attended about half his scheduled visits with P.P.

Mother and father successfully moved for a bonding study, and the section 366.26 hearing was continued. Around the same time, parents learned for the first time that P.P. was in the car with his then-foster mother when she was arrested for driving under the influence the previous October. In April 2024, the juvenile court held a conference with counsel to discuss the issue. The court stated it was "very uncomfortable with how this case is progressing," given that P.P. had already had six placements at such a young age.[4] It was also concerned about the drunk driving incident and the Department's failure to disclose it to parents. The court opined that the system was doing P.P. more harm than good, saying that "every time something goes wrong on our end, it leads the parents further away from wanting to cooperate with us." The court concluded, "I cannot feel okay with

---

[4] The February 2024 section 366.26 report indicated that P.P.'s current placement was his sixth placement. The record reflects that after his initial removal in August 2022, P.P. changed placements a week later and then in November 2022, February 2023, October 2023, and December 2023.

9

all these changes that are occurring with the minor when I know that there is one consistent person in his life, and that has been his mom."

Meanwhile, between January and March 2024, mother filed more section 388 petitions, some without her counsel's involvement.[5] Again, she sought P.P.'s return to her care. The Department responded to the petitions in May, taking the position that mother failed to demonstrate changed circumstances. The Department's primary concern was mother's continuing failure to drug test as ordered. Between January and May, mother missed 22 tests and completed three, one of which was negative (in late April) and two of which were positive for amphetamines (in mid-May). The Department offered mother a hair strand test, which "would provide results for up to 90 days," but she declined it.

Mother withdrew her pending section 388 petitions before the juvenile court ruled on them, and she filed the one at issue in August 2024. Mother requested that P.P. return to her custody with family maintenance or, alternatively, that her reunification services be reinstated. In support of the petition, mother provided evidence that she had moved from the paternal grandparents' house to a shelter, where P.P. could live with her; had resumed individual therapy; and was participating in an outpatient drug program, dependency drug court, and Narcotics Anonymous meetings. She had begun testing through the probation department, and she tested through the shelter, the outpatient program, and drug court as well. The test results

---

[5] During the same period, father also filed two section 388 petitions seeking additional reunification services. Father appealed from the juvenile court's denial of both petitions, and we dismissed the appeal after his appellate counsel filed a no-issues statement. (*In re P.P.* (Oct. 1, 2024, A170632).)

submitted showed a May 31 positive test for methamphetamine but several negative tests over the next two months.

In August, the Department also filed an addendum section 366.26 report. The Department continued to recommend that parents' parental rights be terminated and adoption be P.P.'s permanent plan. The foster parents provided a stable, positive home for P.P. and were committed to adopting him. The Department had also received the bonding study, which a psychologist completed the previous month. The study concluded that mother had a "moderately strong and positive" parent-child relationship with P.P. and father had a "relatively weak and moderately positive" one. The study also concluded that discontinuing both relationships "would not negatively affect [P.P.'s] long-term well-being."

The Department confirmed that mother had moved into a shelter, but only after the paternal grandmother decided to sell the grandparents' home. Mother began regularly drug testing as required in late May, missing eight unexcused tests and returning twelve negative tests. The Department acknowledged mother's change in living situation and willingness to test were positive changes. But she continued to "minimize" father's domestic violence, and the status of parents' relationship was unclear. The Department opined that P.P. had an "urgent need for permanency," and it was unfair to delay permanency "pending [mother's] commitment to her journey of sobriety."

The following month, the Department filed a response to mother's section 388 petition. Since the previous report, mother submitted a negative hair-strand test. Mother was participating consistently in the outpatient treatment program, and her counselor reported that she was highly motivated. The Department "commend[ed mother] for her efforts," but it

11

"maintain[ed] that (21) negative tests out of (168) [scheduled] tests [was] not changed circumstances, but rather changing circumstances." The Department also reiterated its concerns about mother's failure to address domestic-violence issues.

A contested hearing on mother's section 388 petition and termination of parental rights under section 366.26 was held over several days in late September and October 2024. Numerous witnesses testified, including the psychologist who prepared the bonding study, the assigned social worker, several of mother's service providers, and mother herself. In support of granting the petition, mother argued she had made numerous positive changes, including maintaining her sobriety, testing regularly, and improving her living situation. Parents also argued they established the parental-benefit exception to terminating parental rights.

The juvenile court denied mother's section 388 petition on the basis that she failed to demonstrate "a substantial change of circumstance." The court commended mother for the "very positive change" of becoming willing to work on herself. But she was at just "the beginning" of addressing her issues. First, although she was engaged in outpatient drug treatment, she had not completed the program. She was "on step four of twelve" at Narcotics Anonymous, further indicating she was merely "in the process of really getting to know [her]self and what ha[d] put [her] in this situation." Mother had been at the shelter, which provided an 18-month program that included substance abuse support, for only about four months, and her caseworker recommended she stay the full term. Finally, the court was concerned that mother lacked insight about domestic violence in her relationship with father, an issue she had done little to address. Addressing mother, the court concluded, "I can tell you that this was a very difficult decision for me . . . . I

12

very much want [P.P.] to be in your care. . . . But I can't ignore that you're just in the beginning stages, and what you're showing is a changing of your circumstances, a changing of your understanding."

As for the section 366.26 issues, the juvenile court found that P.P. was adoptable, which neither parent disputed. The court then concluded that the parental-benefit exception did not apply to either parent. After indicating that mother presented "truly probably the strongest parental exception . . . case that we have had in a very long time," the court determined that she satisfied the first two elements of the exception, regular visitation and a beneficial relationship, but failed to establish the third element, detriment to P.P. if parental rights were terminated. In explaining its ruling, the court observed that P.P. was doing well in his placement and considered his foster parents to be parental figures. It agreed with the bonding study that "the minor [did] not seem to depend on the relationship with . . . parents for his healthy emotional, mental[,] or developmental growth." He enjoyed visits with mother, but he did not display any distress in returning to the foster parents, who could give him a permanent, stable home. Though there would be "some harm" from losing his relationship with mother, it was outweighed by the benefits he would derive from being adopted.

As for father, the juvenile court found he failed to meet the first two elements of the parental-benefit exception. Unlike mother, father had "not had consistent visits with [P.P.]" and "missed several visits by choice." The court also agreed with the bonding study's conclusion that P.P. did not have "a very strong relationship with . . . father." Indeed, the bonding study "indicated that it would . . . be detrimental to the minor" to continue his relationship with father. Having concluded the exception did not apply to either parent, the court terminated mother's and father's parental rights.

13

II.

DISCUSSION

*A.     No Error Appears in the Denial of Mother's Section 388 Petition.*

Mother claims the juvenile court applied the wrong legal standard in denying her section 388 petition on the basis that she failed to demonstrate changed circumstances.  She also claims the evidence required a finding in her favor on that issue.  We reject both contentions.[6]

Under section 388, a juvenile court order may be modified "when the moving party (1) presents new evidence or a change of circumstance and (2) demonstrates modification of the previous order is in the child's best interest."  (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194 (*Matthew M.*); § 388, subd. (a)(1).)  As the moving party, mother had the burden to demonstrate these requirements by a preponderance of the evidence. (*Matthew M.*, at p. 1194; *In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).) "The section 388 modification procedure [provides] an ' "escape mechanism" when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights.' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845–846.)  As such, the statute "is vital to the constitutionality of [the] dependency scheme as a whole, and the termination statute, section 366.26, in particular."  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528, italics omitted.)

We review the denial of a section 388 petition for an abuse of discretion. (*N.F.*, *supra*, 68 Cal.App.5th at p. 121.)  A juvenile court " 'abuses its

---

[6] As a result, we need not address mother's claim that the evidence also compelled a finding that the requested change was in P.P.'s best interests. We also necessarily reject her claim that the erroneous denial of the section 388 petition requires reversal of the order terminating parental rights.

14

discretion when it applies the wrong legal standard or its factual findings are not supported by substantial evidence.' " (*In re R.F.* (2023) 94 Cal.App.5th 718, 728.) But if the court finds against the party with the burden of proof, " 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156.) Rather, "the question is 'whether the evidence compels a finding in favor of the appellant[] as a matter of law.' " (*Id.* at p. 1163.) Thus, where, as here, the court determined "the moving party failed to carry [the] initial burden to demonstrate new evidence or change of circumstance," we consider only "whether that finding is erroneous as a matter of law." (*Matthew M.*, *supra*, 88 Cal.App.5th at p. 1194.)

   1.  The trial court applied the appropriate legal standard.

 Mother first argues that the juvenile court abused its discretion by finding she made " 'a very positive change [in her] willingness to . . . work on herself' " but nonetheless denying the section 388 petition because her circumstances were only " 'changing,' " not changed. She claims the court thereby required her to show that her circumstances were "*completely* changed," in violation of section 388's "statutory mandate and Legislative intent."

 " 'Not every change in circumstance can justify modification of a prior order' " under section 388. (*N.F.*, *supra*, 68 Cal.App.5th at p. 120.) The change "must be material" (*ibid.*), such that "the problem that initially brought the child within the dependency system [is] removed or ameliorated." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) Where a parent's substance abuse is at issue, "a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*N.F.*, at p. 121.)

The distinction between "changed" and "changing" circumstances is "frequently drawn in cases concerning section 388." (*N.F.*, *supra*, 68 Cal.App.5th at p. 121, fn. 3 [collecting cases].) As *N.F.* explains, the distinction is "another way of describing" the difference "between changes that are material and those that are not. However expressed, the point is that section 388 requires a change that is relevant and substantial (rather that irrelevant or de minimis) when considered in light of all the circumstances in the case." (*Ibid.*) Thus, to the extent mother claims the juvenile court erred merely by characterizing her circumstances as "changing," we reject her position. The court's language did not suggest that she was required to demonstrate her circumstances were "*completely* changed," as opposed to *materially* changed.

Mother argues that the juvenile court's reliance on the distinction between "changed" and "changing" circumstances "was 'too cavalier given the important role section 388 petitions play in the constitutionality of California's dependency scheme.' " (Quoting *In re Serenity S.* (2020) 55 Cal.App.5th 355, 379.) In dicta, *Serenity S.* questioned whether the lower court properly determined that a father failed to establish changed circumstances. (*Ibid.*) But the child in that case was removed "based only on allegations against [the] mother," and the father presented significant evidence that he had addressed the "problems arising from his poverty" that led to his being denied custody. (*Id.* at pp. 359, 379.) Among other things, "he had finally obtained a permanent full-time job at higher pay as well as health care and childcare assistance that would benefit [the minor]." (*Id.* at p. 379.) Here, in contrast, the juvenile court found that mother's primary change was her *willingness* to address the key problem that led to P.P.'s removal, her substance abuse. Thus, characterizing her circumstances as

16

"changing" did not hold her to an unduly high standard. Rather, it reflected the court's legally appropriate determination that she was in only "the beginning stages" of achieving the required material change.

>  2.  The evidence did not compel a finding of changed circumstances.

Mother also claims that even if the juvenile court applied the correct legal standard, it still abused its discretion by denying her section 388 petition because "[s]ubstantial evidence supported a finding of change of circumstances and not a contrary finding." She recites at length the evidence of her recent sobriety and her motivation to remain drug free. But even if we agree with mother that she decisively proved she "had been sober for 90 days" and "had been regularly attending outpatient drug treatment . . . for two months," this evidence did not require a finding in her favor as a matter of law. (See *Matthew M.*, *supra*, 88 Cal.App.5th at p. 1194; *In re Aurora P.*, *supra*, 241 Cal.App.4th at p. 1156.) As we have said, short periods of sobriety generally do not qualify as changed circumstances under section 388. (See, e.g., *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months of sobriety insufficient where father had history of "periods of sobriety alternat[ing] with recurring drug use"]; *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].) Likewise, given her history, mother's recent participation in more structured drug treatment did not establish a material change in her circumstances. (See, e.g., *N.F.*, *supra*, 68 Cal.App.5th at p. 121 [mother's completion of 90-day inpatient drug treatment insufficient to demonstrate changed circumstances]; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079, 1081 [no error in denial of section 388 petition where parents' focused efforts to address drug use "were only three months old"].)

17

Nor did the evidence of mother's commitment to recovery compel a finding of changed circumstances. Mother suggests that in light of this evidence, the juvenile court could not reasonably infer "that she was likely to relapse in the future." But the issue was what change had *already* occurred, not what mother's mindset suggested about her chances of future success. The juvenile court clearly credited her, as do we, with a sincere commitment to achieve sobriety, and this change in attitude was a necessary stepping stone to recovery. But even though mother was "exerting [herself] considerably to improve," her efforts did not amount to a material change in her circumstances as a matter of law. (*In re C.J.W.*, *supra*, 157 Cal.App.4th at p. 1081.) In short, the court did not abuse its discretion by denying mother's section 388 petition on the ground that she failed to demonstrate changed circumstances.

> B.     *The Juvenile Court Properly Found that the Parental-benefit Exception Did Not Apply to Either Parent.*

Both parents claim the juvenile court erred by determining they did not meet the parental-benefit exception to termination of parental rights. We are not persuaded.

> 1.     General legal standards

After a juvenile court determines that a child is adoptable, it must "terminate parental rights and order the child placed for adoption" unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One such exception is the "parental-benefit exception," whose scope the Supreme Court clarified in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). To establish the exception, a parent has the burden to show, by a preponderance of the evidence: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Id.* at pp. 631, 636, italics omitted.)

18

*Caden C.* also clarified that a "hybrid" standard of review applies to a juvenile court's ruling on the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) We review a court's findings on the first two elements, each of which requires "essentially a factual determination," for substantial evidence. (*Id.* at pp. 639–640.) In doing so, we " 'consider[] the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' " (*In re I.E.* (2023) 91 Cal.App.5th 683, 691.)

The juvenile court's finding on the third element, which requires "a delicate balancing" of "the harm of losing the relationship against the benefits of placement in a new, adoptive home," is reviewed for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Under this standard, no abuse of discretion occurs unless the juvenile court " ' " 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.) Again, " 'the use of an incorrect legal standard necessarily constitutes an abuse of discretion.' " (*In re P.S.* (2024) 107 Cal.App.5th 541, 553.)

### 2. Mother's claim

Mother argues the juvenile court applied the incorrect legal standard in two respects when finding she did not satisfy the parental-benefit exception's third element, that terminating parental rights would be detrimental to the child. In evaluating this element, a juvenile court "must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Specifically, the court must determine whether " 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent]' " outweighs "the security and stability of a new home." (*Ibid.*) This does not involve

19

"comparing the parent's attributes as a custodial caregiver relative to those of any potential adoptive parent(s)," as "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Id.* at p. 634.) Thus, the court "should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)

First, mother claims the juvenile court erred by determining that terminating her parental rights "would not be detrimental to P.P. because he did not rely on [her] for his 'healthy emotional, mental[,] or development[al] growth,' " since she was not required to show that "she played a classically 'parental' role in [her son's] life" by attending to his daily needs. This argument echoes a common challenge to rulings on the *second* element of the parental-benefit exception, the existence of a beneficial relationship. Before *Caden C.*, courts generally required parents to show they " 'occupie[d] a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent,' " but "*Caden C.* did not use the words 'parental role' in its analysis." (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 209–210.) Rather, *Caden C.* held that to establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) Based on the tension between the concept of a parental relationship and *Caden C.*'s discussion of the required beneficial relationship, some post-*Caden C.* decisions reversed orders terminating parental rights where the lower court focused on the lack of a "parental bond" or "parental role" in

determining the statutory exception was not met.  (E.g., *In re L.A.-O.*, at pp. 210–211; *In re J.D.* (2021) 70 Cal.App.5th 833, 863–865.)

Relying on such decisions, mother claims the juvenile court's statement that P.P. did not depend on her "for his healthy emotional, mental[,] or developmental growth" was "the functional equivalent of requiring a non-custodial parent to show they occupy a daily 'parental role' in that they provide for the child's everyday needs, something a parent who invokes this exception is simply unable to show."  We are not persuaded.  The observation that the relationship was not crucial to P.P.'s growth did not amount to requiring mother to demonstrate that she played a daily parental role in her son's life, in violation of *Caden C.*, or that P.P. had "a 'primary attachment' " to her, in violation of a pre-*Caden C.* decision she also cites.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 299 (*S.B.*).)  Rather, once it concluded that mother *did* have a beneficial relationship with P.P., the juvenile court had to balance the harm of losing that relationship against the "benefits of a new adoptive home."  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  None of mother's authorities suggest the court was foreclosed from considering the nature of the relationship, including mother's relative lack of influence on P.P.'s growth, in performing the required evaluation.

Second, mother claims the juvenile court erred by concluding that any detriment to P.P. would be "offset simply because [he was] in a secure placement with caregivers who could help mitigate the distress [he] would feel at the loss of a significant relationship" with her.  Again, she relies on *S.B.*, which questioned an argument that "any detriment to [the child] from the loss of the parent-child relationship will eventually be ameliorated by time and [the child's] strong relationship with [the child's primary caregiver]."  (*S.B.*, *supra*, 164 Cal.App.4th at p. 299.)  *S.B.* observed that

children can be expected to develop a secure relationship with their primary caregiver, and the strength of that relationship "does not negate the harm [a child] would experience from the loss of [the child's] significant, positive, emotional relationship with [the parent]." (*Id.* at pp. 299–300.)  In other words, "the proposition that [a child's] loss may be healed by time and support, even if true, does not support a finding [the child] would not be greatly harmed by termination of parental rights." (*Id.* at p. 300.)

Mother does not clearly identify which statements by the juvenile court allegedly violated this aspect of *S.B.*  She quotes the court's statements about P.P.'s attachment to the foster parents and its observation that his needs were being met and " 'permanent, long-term stability [was] within reach,' " but the court never suggested that P.P.'s relationship with his foster parents would "negate" any harm he experienced from losing his relationship with mother.  Rather, as *Caden C.* requires, the court balanced the harm it acknowledged *would* result from terminating mother's parental rights against the "instability" and "uncertainty" P.P. would experience if he were not adopted.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 634.)  In performing this balancing, the court was not precluded from considering the extent to which P.P. was attached to and secure with his prospective adoptive parents.

In sum, mother fails to demonstrate the juvenile court applied improper legal standards in concluding that she did not meet the third element of the parental-benefit exception.  Thus, although we recognize mother's strong love for P.P. and the effort she expended throughout this case to preserve her relationship with him, the court did not err in terminating her parental rights.

### 3.	Father's claim

Father claims the juvenile court erred in various respects by determining that the parental-benefit exception did not apply to him.  We reject his claim that insufficient evidence supported the court's first-element finding that he did not have regular visitation and contact with P.P.  Therefore, we need not address his arguments regarding the exception's other two elements.  (See *In re Natasha A.* (1996) 42 Cal.App.4th 28, 38 [lower court's order may be affirmed if "correct on any ground"].)

Determining whether a parent has met the first element of the parental-benefit exception "is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'  [Citation.]  Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent,' " and a juvenile court should focus on that aspect of visitation in evaluating the element.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632; *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069–1070.)

The juvenile court found that "father ha[d] not had consistent visits with [P.P.]," having "missed several visits by choice."  Substantial evidence supports this finding.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 639.)  Father visited P.P. consistently during the first year or so of the case.  But father began missing visits in the summer of 2023, after the Department required parents to have separate visits because of the domestic violence incident that April.  According to the Department's reports, father missed two visits each in July, August, September, and October 2023, and one visit each in December 2023 and January and February 2024.

The bonding study stated that father's "visitation attendance ha[d] been inconsistent since his visits were reduced to once a month" on the

titrated schedule implemented after the juvenile court terminated his reunification services in November 2023. Similarly, the social worker reported that father's attendance was "on and off," with father visiting P.P. in June 2024 for the first time in two months. Father told the psychologist who prepared the bonding study that he stopped visiting consistently " 'because [he was] tired of confusing' " P.P. and " 'want[ed] him to have normalcy.' "

Despite this evidence of numerous missed visits over several months preceding the section 366.26 hearing, father claims there was insufficient evidence to support the juvenile court's ruling solely because the bonding study lacked "a discrete finding that [his] visitation was too inconsistent for purposes of establishing a parental bond, especially as the study found there was a bond." Father offers no authority suggesting that the existence of a parental bond can substitute for consistent visitation, much less that expert evidence is required to establish the first element of the parental-benefit exception. Here, the juvenile court relied on evidence that father was not only routinely missing visits but intentionally pulling back from his relationship with P.P. However understandable father's feelings were given the case's posture, his failure to continue visiting consistently justified the court's finding that he did not establish the parental-benefit exception.

## III.
### DISPOSITION

The October 23, 2024 order denying mother's section 388 petition and the November 7, 2024 order terminating mother's and father's parental rights to P.P. are affirmed.

_____

Humes, P.J.


WE CONCUR:


_____

Banke, J.


_____

Smiley, J.


*In re P.P.* A171814

25